[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-12802

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 16, 2011
JOHN LEY
CLERK

D.C. Docket No. 06-80171-CR-DTKH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LIANA LEE LOPEZ,
DANNY VARELA,
a.k.a D.V.,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(August 16, 2011)

Before CARNES, KRAVITCH, and SILER,[*] Circuit Judges.

_____

[*] Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

CARNES, Circuit Judge:

This appeal stems from a violent drug conspiracy in South Florida that involved a number of criminals, most of whom have aliases or nicknames. The four whose joint trial led to this appeal were Daniel "D.V." Varela, Liana "The Negra" Lopez, Ricardo "Rick" Sanchez, and Daniel "Homer" Troya. Showing a keen appreciation for their own character, they referred to the townhouse where they lived as the "Thug Mansion." During their crime wave two of the self-styled thugs, Troya and Sanchez, carjacked a fellow drug dealer and shot him to death. What would have been unfortunate became triply tragic when they also gunned down the drug dealer's wife and their two children, ages three and four. Troya and Sanchez left all four bodies on the side of the road.

The ensuing police investigation led to the Thug Mansion, which was located in a gated residential community. Officers executed a search warrant there and found evidence of the murder and the on-going drug conspiracy. An indictment and two superseding indictments followed, and then a trial at which the four defendants were convicted on all counts. Lopez and Varela, who brought this appeal, raise several issues, the primary one being that they should not have been jointly tried with Troya and Sanchez, who committed the murders. (Sanchez and

Troya were convicted of those murders and sentenced to death, and they have filed appeals that are proceeding separately from this one.)

I.

On May 10, 2006, an officer stopped Lopez, who was driving a white Cadillac with a suspicious looking tag, a temporary one held on with electrical tape. Before Lopez pulled over to the curb the officer saw her bend down to her right, appearing to fiddle with something on the passenger side floorboard. During a search following the stop the officers found two kilograms of powder cocaine and more than $14,000 cash in a black bag on the passenger side floorboard. Later, officers discovered Varela's fingerprint on the car's temporary tag.

Lopez often made rounds on behalf of Varela to deliver drugs to customers and collect money from customers who bought drugs on credit. She later told Kevin Vetere, a government witness who lived with the defendants at the Thug Mansion, that was why she had the cocaine and cash in her car on the day the officers stopped her.

A month later, on June 10, 2006, officers stopped Varela while he was driving a black Chevy Lumina and Troya was riding in the backseat. The officers made the stop in part because the car had abruptly turned around within sight of a police checkpoint. They discovered two handguns in a hidden compartment in the

3

middle of the car's front bench seat, marijuana residue elsewhere in the car, and more than $1,300 cash in Varela's pockets. The officers arrested Troya for possession of marijuana and Varela for that charge and for being a felon in possession of firearm.

Another month later, on July 10, 2006, an officer saw a white Ford Taurus with a suspicious temporary tag held onto the car with electrical tape and similar in appearance to the tag that was on Lopez's car two months earlier. The officer attempted to pull over the Taurus after receiving a dispatcher's report that the car's tag was stolen.[1] Sanchez, the driver of the Taurus, attempted to elude the officer but lost control of the car and crashed into a tree. He fled the car with half a kilo of cocaine in a shoebox but the cocaine spilled onto the ground when he stumbled while running away. Police caught up with Sanchez nearby and arrested him.

Despite those arrests, all four members of this gang were soon back out on the streets. That same summer, a fellow drug dealer, Jose "Lou" Escobedo, his wife Yessica, and their two sons, a four-year-old and a three-year-old, along with Escobedo's cousin Crystal called on Varela and Lopez at their residence in South Florida at the time, a house they called the "Pimp Plaza." Escobedo was involved

---

[1] Stacks of temporary license tags had been seen in Varela's possession, and some of the tags associated with the vehicles in this case had been reported stolen from a local car dealership in May 2006. Those tags were used to prevent the police from tracing a fleeing vehicle back to the gang.

in narcotics and transported drugs from Texas and Mexico to Florida. The Escobedo family moved to Florida about three weeks after Escobedo had met Varela in Texas. The two men were seen together in Texas and in Florida on multiple occasions.

On the visit to the Pimp Plaza with the Escobedos, Crystal saw large amounts of money being counted in the kitchen in Lopez's presence. Not wanting the impressionable Escobedo youngsters to see what was going on, she took them upstairs. The scenery was not any better up there where she saw about 50 handguns on a bed, and she brought the children back downstairs. When Crystal questioned Sanchez about the presence of all of those guns, he told her that there were more in the closet of the other bedroom.

During the gang's time at the Pimp Plaza, Lopez sometimes carried a shotgun around the house because of a previous robbery. The robbery had put her on edge because the perpetrators had pistol whipped Escobedo and held a gun to his head until Lopez told them where the money and the cocaine were stashed in the Pimp Plaza. Those robbers ran off with some handguns, with about $100,000 cash they found in a bag, and with a kilo of cocaine that had been in a laundry basket. There was more cocaine in the laundry basket, but the robbers had not dug deep enough into the gang's dirty laundry to find it.

5

Soon after that robbery, Lopez and Varela packed up and moved the gang from the Pimp Plaza to the Thug Mansion. Varela rented the place, paying cash for rent and for the security deposit. Varela and Lopez shared the master bedroom. Sanchez and Troya each had their own bedroom, as did Jose Gutierrez.[2] Vetere slept on an air mattress on the dining room floor.

Around that time, Lopez frequented strip clubs and gave the strippers yellow baggies filled with cocaine. When she ran out of baggies, Varela would send her back to the Thug Mansion for more. Lopez also delivered brown paper bags, cereal boxes, and shoeboxes containing cocaine to various individuals, including on at least one occasion to Escobedo. On another occasion Elvia Castillo, a government witness and Lopez's friend, saw Varela carrying "[a] little white brick" and heard him ask Lopez for acetone—a chemical used to dilute cocaine in order to produce for sale a larger amount of less-pure cocaine.

After an argument at a club, Varela asked someone who was with Castillo to go to the Thug Mansion for "the little chopper," a firearm. Castillo went along and at the Thug Mansion she saw Lopez go into the master bedroom closet, get the firearm, and wrap it up in a shirt to be taken to Varela. Lopez once asked Castillo

---

[2] Gutierrez pleaded guilty to conspiracy to possess cocaine with intent to distribute and was sentenced to 216 months imprisonment, a sentence we affirmed. See United States v. Gutierrez, 373 Fed. App'x 13 (11th Cir. Apr. 8, 2010) (unpublished).

not to sit in a bean bag chair because Lopez had just filled the bag with "bricks"—the gang's slang for kilos of cocaine. Castillo also heard Lopez, after ending a phone call, say that someone needed an "Xbox," which was more of the gang's slang for kilos of cocaine. Varela sold narcotics to Mario Calderon, a government witness and former narcotics customer of his, from late 2005 until Calderon's arrest in July 2006. They did a lot of drug business together during that time span; Varela sold Calderon an average of three kilos a week. Sanchez delivered some of the drugs to Calderon for Varela, and Lopez began participating in some of those deals in early 2006, occasionally making deliveries. On one occasion Calderon dealt directly with Lopez. Calderon estimated that he had purchased over 80 kilos of cocaine from Varela, Lopez, and Sanchez during the course of their deals together.

Late in the afternoon of October 12, 2006, Troya and Sanchez climbed into the gang's burgundy van, and Vetere tried to join them and tag along for the ride as he had done before on other drug-related business.[3] That particular time, however, he was told he could not go along. Varela confirmed over the phone to Troya that Vetere was not to be invited on that particular trip.

---

[3] For example, the gang used the burgundy van in a botched home invasion that involved an attempt by Varela, Troya, Sanchez, Vetere, and Gutierrez to steal drugs from another dealer.

Cell phone evidence showed that in the evening hours of October 12, 2006 and early morning hours of October 13, 2006, multiple calls were made between Sanchez's cell phone and Escobedo's cell phone.[4] Cell phone tower records showed that Sanchez's, Troya's, and Escobedo's phones were all traveling north up the I-95 corridor along Florida's east coast during the evening of October 12. A highway patrol officer also saw the burgundy van heading north on I-95 just south of Daytona Beach around 9:00 p.m. and reported the van's tag as a part of his routine patrol. The cell phone location pattern changed around midnight on October 12, showing that Troya's, Sanchez's, and Escobedo's phones were headed in the opposite direction, south along Florida's east coast.

Toll booth security cameras and toll tickets showed that Escobedo's black Jeep Cherokee and then the burgundy van entered the Florida Turnpike one after the other at the Fort Pierce exit at 2:18 a.m. on October 13. About six minutes later, two series of popping noises that sounded like gunfire awoke a couple who lived near the turnpike in the vicinity of where the bodies of the Escobedo family were later discovered. Three minutes after that, at 2:27 a.m., a call was made from Troya's cell phone to Sanchez's cell phone. That was the first call between those two phones all night.

---

[4] Cell phone records show which phone made a call and which phone received it, but do not show who dialed the numbers or who answered the call.

Within a few minutes of that call and just before 2:30 a.m., calls were made from both Troya's and Sanchez's cell phones to Varela's. Toll booth camera footage and toll tickets showed the burgundy van and Escobedo's Jeep exiting the turnpike onto Okeechobee Boulevard in West Palm Beach at 3:01 and 3:02 a.m. respectively. Troya's partial palm print was on one of the toll tickets and Sanchez's was on the other.

Sometime later that same morning, a late night guest at the Thug Mansion was driving home and spotted a burgundy van followed by what looked like Escobedo's Jeep driving into the gated community in which the Thug Mansion was located. After 3:00 a.m., Vetere saw Varela, Sanchez, Troya, and Gutierrez enter the Thug Mansion and head toward the master bedroom, each carrying a bag similar to those they normally used to carry kilos of cocaine. Sometime after 3:30 a.m., a stripper named Sexy Yellow called Vetere to bring her some marijuana. He grabbed from Sanchez's room a set of keys to the only available vehicle at that time, the burgundy van, and drove it to Sexy's home.

After Vetere reached Sexy's place, Troya called and told him that Varela was upset about his taking the van and wanted it back immediately. On the way back, Vetere got a phone call from Varela sending him to Varela's uncle's house. When Vetere got there, he saw Escobedo's Jeep parked behind the house. A little

while later Varela, Gutierrez, Sanchez, and Troya arrived in the Taurus. Vetere asked Varela why he was upset about the van, but Varela told him not to worry about it and to drive Escobedo's Jeep to Vetere's grandmother's house. Gutierrez picked up Vetere at his grandmother's place a short time later, and around sunrise the two of them, along with Varela, Sanchez, and Troya, went to breakfast at a restaurant.

That same morning of October 13, 2006, a traveler making his way down the turnpike discovered what he thought to be a stranded family sleeping on the ground by the side of the road. Escobedo, his wife, and their two young children were not sleeping; they were dead. Each of them had been shot multiple times in the head and body. Two different firearms had been used.

Later that day officers searched the Escobedo's home and found that someone had ransacked it, leaving no cabinet, closet, or attic door unopened. In the garage, however, the officers found a bag with some cocaine inside, a red suitcase labeled "Embark," and a ledger of the type kept by drug traffickers. That ledger contained a number of names including "D.V.," "Rick," "Homer," and "Negra" with various sums next to those names. (As we have already mentioned those were the nicknames or aliases of Varela, Sanchez, Troya, and Lopez.)  The officers also found in the Escobedo home booking sheets relating to the May 10,

10

2006 and July 10, 2006 traffic stops and arrests of Lopez and Sanchez, which we have already discussed.

A few days after the bodies were found, Troya bragged to a long time friend, Melvin Fernandez, that he had just "licked," which is criminal slang for robbed, someone for 15 kilos of cocaine. On October 16, 2006, which was three days after the murders, officers recovered Escobedo's Jeep in an industrial area of West Palm Beach. Some matches and a container filled with gasoline were found near it. Troya told Vetere that he had moved the Jeep from Vetere's grandmother's house and had planned to burn it, but authorities got to it first.

The next day, October 17, 2006, Gutierrez, at Varela's direction, took the burgundy van to a paint and body shop. Varela, known to the shop owner as "D.V.," told the owner to paint the van "candy green" and repair some notable scratches on the roof. After seeing a television news account of the turnpike murders, the shop owner contacted law enforcement. Officers searched the van and found a number of zip ties and a little red suitcase with an "Embark" logo on it, which was similar to the one on the suitcase found in Escobedo's garage. Inside the suitcase from the van was a hotel receipt dated October 11, 2006 and signed by Escobedo's wife. Also inside it were some children's toys.

In October 2006, the DEA asked Malik Mullino, one of its informants, to reinitiate contact with Varela. For about a year, between 2004 and 2005, Mullino had purchased large quantities of cocaine from Varela, in all about 70 kilos. During their dealings, the two of them had used code words like "Xbox" for a kilo of cocaine.

On October 19, 2006, Mullino spoke with Varela over the telephone and Varela asked him if he needed "some work"— one of their code words for cocaine. Two days later, on October 21, Mullino, under DEA supervision, placed a recorded phone call to Varela, indicating he had money to buy cocaine, and Varela responded, "I got them in stock, Dog," indicating he had cocaine available. Later that same day after searching Mullino and his vehicle for drugs, the agents gave him enough cash to purchase a half kilo of cocaine from Varela. The agents kept Mullino under audio surveillance the entire time, and also under visual surveillance except for the time he was inside the Thug Mansion.

As planned, Varela met Mullino in a parking lot and got into Mullino's car. On the ride over to the Thug Mansion, Mullino gave Varela the cash the DEA had given him. Once there, they found Sanchez hanging out in front of the house, and Varela and Mullino went inside to complete the drug transaction. During the transaction, Varela noted how much crack cocaine Mullino could cook from the

purchase, and Varela showed Mullino a few of his firearms including his "AK" (an AK-47 assault rifle) and his "little UZ" (an Uzi submachine gun). Based in part on their past dealings, Varela gave Mullino a full kilo instead of a half one, with the understanding that Mullino would pay for that additional half later.

After their transaction, Mullino dropped off Varela and Sanchez in the parking lot where Mullino and Varela had met. Mullino then went to another parking lot to meet the DEA agents. He gave them the kilo he had gotten from Varela, which field tested positive as cocaine. Following Varela's arrest, Draciena Berrios, a woman Varela had used to collect money from Mullino in the past, attempted to collect from Mullino the rest of the money he owed Varela for the part of the cocaine he had received on credit during the transaction.

On October 23, 2006, two days before officers would execute a search warrant at the Thug Mansion, Sanchez, in the presence of Troya, Vetere, and Varela, received a phone call from his father asking him about Escobedo's Jeep. After that inquiry, Sanchez "turned the phone off and dropped it on the floor" and told everyone that he thought that police officers had been to his father's house. Vetere responded by announcing that "the heat is on" and Varela ordered everyone to clean house at the Thug Mansion. Lopez joined in the clean up and helped gather up the assorted tools of the drug trade that were in the kitchen and remove

13

ammunition from the laundry room. Most of the firearms were gathered up and, along with cocaine wrappers and other paraphernalia, they were put into bags. Unfortunately for the gang, though, it was not very good at cleaning house.[5]

On October 25, 2006, officers executed a search warrant at the Thug Mansion. After removing Varela, Sanchez, Troya, Lopez, and Gutierrez from the house, the officers discovered several incriminating items in it and in the garage. They found a notebook full of looseleaf papers, which had been used as a drug ledger and contained references to Homer, Rick, and D.V.; they found several bags containing cocaine and cocaine base; and they found kilogram wrappers. In all, the officers found about 300 grams of crack cocaine and 1.3 kilograms of powder cocaine. In addition, they found ski masks, wigs, gloves, handcuffs, body armor, a night vision scope, and a police channel scanner. There were also various tools of the drug trade such as acetone, digital scales, empty pill capsules, coffee grinders coated in white powdery residue, and a plastic heat sealer.

As for weapons, the officers found numerous firearms, loose and boxed ammunition, and loaded ammunition clips. Some of the loaded clips did not go with the firearms found in the home, indicating that some weapons had been

---

[5] Castillo later overheard Lopez tell her mother that there were very few drugs and no cash in the Thug Mansion at the time of the search because the gang had managed to clean house. But she also said that because Sanchez had dropped the ball and failed to finish his chore of getting the guns out of the garage, the officers did manage to find some of the gang's guns.

removed. Forensic tool-mark evidence would later show that some of the rounds that were used in the Escobedo murders had come into contact with ammunition clips found in the garage.[6] The firearms recovered included an AK-47-type weapon and various machine guns, rifles, pistols, and shotguns. The altered length of the barrel of at least one of the rifles found at the Thug Mansion required that it be registered in the National Firearms Registration and Transfer Record. It had not been.

## II.

On February 14, 2008, a federal grand jury in the Southern District of Florida returned a third superseding indictment charging defendants Varela, Troya, Sanchez, and Lopez with various crimes. All four defendants were charged with conspiring to possess with intent to distribute at least 50 grams of cocaine base and at least 5 kilos of cocaine hydrochloride from May 2006 until the date of arrest, October 25, 2006, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count 1); with possessing with intent to distribute on October 25, 2006, at least 50 grams of cocaine base and at least 500 grams of cocaine hydrochloride, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count 13); and with knowingly using and

---

[6] Firearms examiner Allison Quereau testified that firearms and ammunition clips leave marks on bullets and cartridge cases when the firearm is being loaded and fired. She explained that a tool-mark examiner attempts to match a specific tool mark to the particular firearm or ammunition clip that made it.

carrying one or more firearms on October 25, 2006, during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 15). In addition, Lopez and Varela were charged with possessing with intent to distribute on May 10, 2006, at least 500 grams of cocaine hydrochloride, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count 2). Varela and Troya were charged with being felons who had been in possession of firearms on June 10, 2006, in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 2 (Count 3). And Varela, Troya, and Sanchez were charged with being felons who had been in possession of firearms on October 25, 2006, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) and 18 U.S.C. § 2 (Count 14).   In addition to the counts in which he was charged with others, Varela was separately charged in three other counts with:  distributing on October 21, 2006, at least 500 grams of cocaine hydrochloride, in violation of 21 U.S.C. § 841(a)(1) (Count 11); knowingly carrying a firearm on October 21, 2006, during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 12); and knowingly possessing a firearm on October 25, 2006, with a modified barrel that had not been registered with the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. §§ 5861(d) and 5871 (Count 16).

Sanchez was separately charged with one count of possessing with intent to distribute on July 10, 2006, at least 500 grams of cocaine hydrochloride, in violation of 21 U.S.C. § 841(a)(1) (Count 4). Sanchez and Troya were jointly charged in six counts relating to the fatal carjacking: conspiring to take a motor vehicle from a person by force and violence on October 12 and October 13, 2006, which resulted in death, in violation of 18 U.S.C. §§ 371 and 2119(3) (Count 5); taking a motor vehicle from a person by force and violence on October 13, 2006, which resulted in death, in violation of 18 U.S.C. § 2119(3) and 18 U.S.C. § 2 (Count 6); and one count for the murder of each member of the Escobedo family on October 13, 2006, through use of a firearm, during and in the course of committing a crime of violence and a drug trafficking crime, in violation of 18 U.S.C. § 924(j)(1) and 18 U.S.C. § 2 (Counts 7–10). All six counts (Counts 5–10) were capital charges, and the indictment contained the grand jury's special findings about the factors set out in 18 U.S.C. §§ 3591(a)(2)(A)–(D) and 3592(c).

Before trial Lopez filed a Federal Rule of Criminal Procedure 14 motion, which Varela joined, to sever her trial from Troya and Sanchez's. Varela filed his own motion to sever the felon-in-possession charges against him (Counts 3 and 14) from the other charges he faced (Counts 1, 2, 11–13, 15, 16). He also filed a pretrial motion to suppress all of the evidence that had been seized from the Thug

17

Mansion. The district court denied all three of those motions, and the case against the four defendants proceeded to trial.

During jury selection, Varela repeatedly objected to the district court's requirement that the defendants exercise their joint peremptory challenges by unanimous agreement among themselves. The district court overruled those objections. After eleven days of jury selection, the trial began on January 27, 2009.

During trial Varela and Lopez periodically renewed their motions for severance,[7] and each renewal was denied by the district court. After the close of the government's case, Varela called one agent and one officer to testify about the search of the Thug Mansion and Sanchez presented a brief defense. None of the defendants testified. On March 2, 2009, more than a month after the jury was empaneled and sworn, the district court gave the jury its final instructions. After three days of deliberation, the jury found the four defendants guilty on all counts. After trial, Varela once again renewed his motion for severance, which the district court again denied.

---

[7]Any motion to sever after a jury is sworn must be construed as a motion for mistrial. United States v. Blankenship, 382 F.3d 1110, 1119 n.20 (11th Cir. 2004). It is, in effect, a request to declare a mistrial of the case against the moving defendant (but not the nonmoving ones) and to start over with a new jury to try the charges against him. Id. For consistency and simplicity, however, in this opinion we will refer to all motions for a separate trial as motions to sever.

Because he had two or more prior felony drug convictions and the government had filed notice under 21 U.S.C. § 851, Varela was sentenced to a term of life imprisonment, as required by 21 U.S.C. § 841(b)(1)(A). The same day Lopez was sentenced to 180 months imprisonment, to be followed by five years supervised release. Lopez and Varela both filed timely notices of appeal.

They both contend that the district court abused its discretion by refusing to try them separately from Troya and Sanchez. Varela also makes a number of other contentions, including that the district court: abused its discretion by denying severance of his felon-in-possession count from the other counts against him; erred by finding probable cause to search the Thug Mansion; abused its discretion by admitting evidence of his other bad acts; abused its discretion by requiring the exercise of peremptory challenges by unanimous vote; and erred in finding that 21 U.S.C. § 841(b)(1)(A) is constitutional.

III.

Lopez and Varela contend that the district court abused its discretion by failing to exercise its Rule 14(a) authority to grant their motions to be tried separately from Sanchez and Troya who, in addition to being charged with drug and weapons crimes, were capitally charged with four murders. We view this

19

contention against a solid body of law favoring joint trials and placing a heavy

burden on those who want to be tried separately.

A.

Joint trials play a vital role in the criminal justice system and serve

important interests:  they reduce the risk of inconsistent verdicts and the unfairness

inherent in serial trials, lighten the burden on victims and witnesses, increase

efficiency, and conserve scarce judicial resources.  Zafiro v. United States, 506

U.S. 534, 537, 113 S.Ct 933, 937 (1993); Puiatti v. McNeil, 626 F.3d 1283, 1309

(11th Cir. 2010); United States v. Day, 405 F.3d 1293, 1297 (11th Cir. 2005); see

also Richardson v. Marsh, 481 U.S. 200, 210, 107 S.Ct. 1702, 1708 (1987) ("It

would impair both the efficiency and the fairness of the criminal justice system to

require . . . that prosecutors bring separate proceedings, presenting the same

evidence again and again, requiring victims and witnesses to repeat the

inconvenience (and sometimes trauma) of testifying, and randomly favoring the

last-tried defendants who have the advantage of knowing the prosecution's case

beforehand.").  In this circuit, the rule about joint trials is that "defendants who are

indicted together are usually tried together."  United States v. Browne, 505 F.3d

1229, 1268 (11th Cir. 2007); see also Puiatti, 626 F.3d at 1309; United States v.

Chavez, 584 F.3d 1354, 1360 (11th Cir. 2009); United States v. Baker, 432 F.3d

1189, 1236 (11th Cir. 2005); United States v. Novaton, 271 F.3d 968, 989 (11th

Cir. 2001); United States v. Schlei, 122 F.3d 944, 984 (11th Cir. 1997); United

States v. Alvarez, 755 F.2d 830, 857 (11th Cir. 1985); United States v. Perez, 489

F.2d 51, 65 (5th Cir. 1973).[8]

That rule is even more pronounced in conspiracy cases where the refrain is

that "defendants charged with a common conspiracy should be tried together."

United States v. Beale, 921 F.2d 1412, 1428 (11th Cir. 1991); see also Chavez,

584 F.3d at 1360; United States v. Baker, 432 F.3d 1189, 1236 (11th Cir. 2005);

Schlei, 122 F.3d at 984.  In this case all four defendants were charged (and

convicted) of a common conspiracy to possess with intent to distribute cocaine

hydrochloride and crack cocaine.

To be sure, the rule about a joint trial in conspiracy cases is not quite

ironclad.  See Fed. R. Crim. P. 14(a) ("If the joinder of . . . defendants in an

indictment . . . appears to prejudice a defendant . . . , the court may . . . sever the

defendants' trials, or provide any other relief that justice requires.").  The

exceptional circumstances justifying a deviation from the rule, however, are few

and far between.  A defendant seeking a severance must carry the "heavy burden

---

[8] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

of demonstrating [that] compelling prejudice" would result from a joint trial. Browne, 505 F.3d at 1268 (quotation marks omitted). To show compelling prejudice, a defendant must establish that a joint trial would actually prejudice the defendant and that a severance is the only proper remedy for that prejudice—jury instructions or some other remedy short of severance will not work. Zafiro, 506 U.S. at 539–41, 113 S.Ct at 938–39; United States v. Blankenship, 382 F.3d 1110, 1122–23 (11th Cir. 2004).

The potential for prejudice from a joint trial is not enough, and not just any kind of prejudice will do. For example, the Supreme Court explained in Zafiro that "[m]utually antagonistic defenses are not prejudicial per se." Zafiro, 506 U.S. at 538, 113 S.Ct. at 938; see also Blankenship, 382 F.3d at 1122 (noting that Zafiro "specifically rejected the notion that defendants who have contradictory defenses are inherently prejudiced"). And "it is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." Zafiro, 506 U.S. at 540, 113 S.Ct. at 938. Anything that increases the likelihood of a conviction "prejudices" the defendant in the ordinary sense of the word, but in severance law "prejudice" is not used in the ordinary sense of the word.

Because limiting instructions usually will cure any prejudice resulting from a joint trial, Zafiro, 506 U.S. at 539, 113 S.Ct. at 938, the Supreme Court has indicated that severances need be granted only if there is a serious risk that a joint trial would either "compromise a specific trial right of one of the defendants" or "prevent the jury from making a reliable judgment about guilt or innocence" even if limiting instructions are given. United States v. Thompson, 422 F.3d 1285, 1292 (11th Cir. 2005) (quoting Zafiro, 506 U.S. at 539, 113 S.Ct. at 938); Browne, 505 F.3d at 1269; Blankenship, 382 F.3d at 1122. Aside from those two situations, jointly indicted defendants are not entitled to a severance. See Blankenship, 382 F.3d at 1123.

Examples of specific constitutionally protected trial rights that might be jeopardized in a joint trial are the Sixth Amendment right to confrontation and the Fifth Amendment right to remain silent. Id. at 1123 n.24. But those rights are only rarely jeopardized by a joint trial.

Regarding the second category of prejudice, the Supreme Court in Zafiro "did not clearly explain what it meant by a jury being prevented from 'making a reliable judgment'" even with limiting instructions. Blankenship, 382 F.3d at 1123. The Court did, however, provide a few examples where a joint trial might have that effect. Zafiro, 506 U.S. at 539, 113 S.Ct. at 938; see also Blankenship,

23

382 F.3d at 1123–25 (noting that the examples in Zafiro "appear[] to be fairly comprehensive"). One example is where overwhelming evidence of guilt is introduced against a codefendant that would not have been admissible against the defendant in a separate trial, raising the specter of "spillover effect." United States v. Cross, 928 F.2d 1030, 1039 (11th Cir. 1991); see also Zafiro, 506 U.S. at 539, 113 S.Ct. at 938; Blankenship, 382 F.3d at 1123–24. But even then "a court's cautionary instructions ordinarily will mitigate the potential 'spillover effect' of evidence of a co-defendant's guilt." United States v. Kennard, 472 F.3d 851, 859 (11th Cir. 2006).

Another example of a situation in which a severance might be warranted is where the sheer number of defendants and charges, the differing levels of culpability, and the massive amount of evidence make it nearly impossible for a jury to sort through the evidence and issues and reliably determine the guilt or innocence of each defendant on each charge. Blankenship, 382 F.3d at 1124. The bar for showing that kind of prejudice is so high that only in the rarest case can a defendant clear it, as indicated by the fact that we have declined to find that severance was required in some complex, multi-defendant cases. See, e.g., United States v. Hill, ___ F.3d ___, 2011 WL 2314155, *1, 9–15 (11th Cir. June 14, 2011) (affirming the denial of severance in a mortgage fraud case where there

24

were 12 defendants, a 187–count indictment involving more than 300 transactions, over 1,100 exhibits filling 8 filing cabinets, and more than 100 witnesses); United States v. Kopituk, 690 F.2d 1289, 1320 (11th Cir. 1982) (affirming the denial of a severance in a labor corruption case involving 12 defendants, a 70-count indictment, 130 witnesses, and a seven-month trial resulting in 22,000 pages of transcript); see also United States v. Hernandez, 921 F.2d 1569, 1580–81 (11th Cir. 1991) (collecting some of the more complex cases in which this Court has found that the district court did not abuse its discretion in denying severance).

Evidence that is probative of a defendant's guilt but admissible only against a codefendant is another situation that might justify a severance. Zafiro, 506 U.S. at 539, 113 S.Ct. at 938 (citing Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620 (1968)). Conversely, if a joint trial prevented a defendant from introducing exculpatory evidence that would be admissible in a separate trial, a severance might be required. See id. at 539, 113 S.Ct. at 938.

B.

The decision of whether to grant a severance under the circumstances that present themselves in a particular case lies within the district court's sound and substantial discretion. Zafiro, 506 U.S. at 538–39, 113 S.Ct. at 938; Chavez, 584 F.3d at 1360 ("We will not reverse the denial of a motion for severance in the

25

absence of a clear abuse of discretion."); United States v. Ramirez, 426 F.3d 1344, 1352 (11th Cir. 2005) ("We will not reverse the denial of a severance motion absent a clear abuse of discretion resulting in compelling prejudice against which the district court could offer no protection." (quoting United States v. Walser, 3 F.3d 380, 385 (11th Cir. 1993))).

"The application of an abuse-of-discretion review recognizes the range of possible conclusions the trial judge may reach." United States v. Frazier, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc). Or, as we have also explained:

> By definition under the abuse of discretion standard of review there will be occasions in which we affirm the district court even though we would have gone the other way had it been our call. That is how an abuse of discretion standard differs from a de novo standard of review. As we have stated previously, the abuse of discretion standard allows a range of choice for the district court, so long as that choice does not constitute a clear error of judgment.

Id. (quotation marks and alteration omitted) (quoting In re Rasbury, 24 F.3d 159, 168 (11th Cir. 1994)); see also McMahan v. Toto, 256 F.3d 1120, 1129 (11th Cir. 2001) ("[U]nder an abuse of discretion standard there will be circumstances in which we would affirm the district court whichever way it went."). "[W]hen employing an abuse-of-discretion standard, we must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard." Frazier, 387 F.3d at 1259 (citing Maiz v. Virani, 253 F.3d 641, 662

(11th Cir. 2001)).  This Court is rightly reluctant to second guess a district court's decision on whether to sever.  See Baker, 432 F.3d at 1236; Ramirez, 426 F.3d at 1352; Novaton, 271 F.3d at 989.

C.

It is through that highly deferential lens that we review the district court's discretionary decision to deny Lopez's and Varela's motions to sever.  Varela makes most of the arguments on this issue, so we will organize our discussion around his statements of them.

Varela argues that forcing him to stand trial jointly with Sanchez and Troya, who faced capital charges that he did not, resulted in:  1) a prolonged jury selection and trial; 2) the requirement that peremptory strikes be exercised by unanimous agreement among the four defendants; 3) his capitally charged codefendants bringing out in cross-examination of some of the witnesses matters not relevant to Varela's case; 4) trial by a death-qualified jury; 5) one of his codefendant's attorney conceding to the jury that there was a drug conspiracy and that Varela was the head of it; and 6) five hours of medical examiner autopsy testimony about, and gruesome photos of, the four murder victims.[9]

---

[9] Lopez echoes two of Varela's arguments, asserting prejudice from the joint trial because it resulted in trial by a death-qualified jury and the medical examiner autopsy testimony about, and gruesome photos of, the four murder victims.

27

The first three of those effects—a longer jury selection and trial, the joint exercise of peremptory challenges, and harmful evidence being brought out by a codefendant's counsel in cross-examination of witnesses—occur in many, if not most, joint trials. To hold that they constitute cognizable prejudice for severance purposes would go a long way toward making joint trials the exception instead of the rule, contrary to controlling precedent.

This joint trial was different from most because it resulted in the jury being death-qualified, which it would not have been if Varela and Lopez had been tried separately from Sanchez and Troya. But having guilt determined by a death-qualified jury is not legally cognizable prejudice. See Buchanan v. Kentucky, 483 U.S. 402, 420, 107 S.Ct 2906, 2916 (1987). In Buchanan the Supreme Court held that, even assuming death-qualified juries are conviction prone, there is no constitutional right to have guilt determined by a jury that has not been death-qualified. Id. at 420, 107 S.Ct at 2916. On the basis of Buchanan, the Fourth and Fifth Circuits have rejected any per se rule requiring severance when a noncapital defendant is tried alongside a capital defendant. See United States v. Lighty, 616 F.3d 321, 351 (4th Cir. 2010) ("A per se rule requiring severance each time a capital defendant and a non-capital defendant are charged with the same crimes certainly would undermine [the Supreme Court's] stated preference [for joint

28

trials].”); <u>United States v. Causey</u>, 185 F.3d 407, 417 (5th Cir. 1999) (“The Supreme Court has rejected the argument that a non-capital defendant cannot receive a fair trial when tried jointly with capital defendants.”).  We agree with those two circuits.

To the extent that Varela and Lopez contend that the joint trial complicated things so much that the jury could not keep the charges and evidence straight, that contention is foreclosed by decisions in which we have affirmed denials of severance motions even though the charges and facts were more complex than in this case.  See <u>United States v. Hill</u>, ___ F.3d ___, 2011 WL 2314155, *1, 9–15 (11th Cir. June 14, 2011); <u>United States v. Kopituk</u>, 690 F.2d 1289, 1320 (11th Cir. 1982); <u>see also</u> <u>United States v. Hernandez</u>, 921 F.2d 1569, 1580–81 (11th Cir. 1991) (collecting cases).

Varela argues that he was seriously prejudiced by being tried jointly with Sanchez and Troya because of statements Sanchez’s attorney made in his closing arguments. The attorney told the jury that Sanchez was on the Florida Turnpike the night the Escobedos were murdered but argued that he was not there to commit murder but instead to provide counter-surveillance for drug deliveries by “the Varela group.” Varela argues that statement constitutes an admission by Sanchez through counsel, and that admission violates the Sixth Amendment’s

29

Confrontation Clause because Varela could not cross-examine Sanchez about it since he exercised his right not to testify. That argument sounds like a good one, but it is not.

The Confrontation Clause generally does prohibit the admission of "testimonial evidence" unless the witness is unavailable and the defendant has had a previous opportunity for cross-examination. Crawford v. Washington, 541 U.S. 36, 68, 124 S.Ct. 1354, 1374 (2004); United States v. Brown, 441 F.3d 1330, 1359 (11th Cir. 2006) ("The Crawford rule applies only to testimonial evidence."). But Sanchez's attorney was not a witness, and the statements he made in his closing arguments were neither testimony nor any other kind of evidence. See United States v. Lopez, 590 F.3d 1238, 1256 (11th Cir. 2009) (noting that "statements and arguments of counsel are not evidence" (quoting United States v. Smith, 918 F.2d 1551, 1562 (11th Cir. 1990))). The district court properly instructed the jury on at least seven different occasions that what lawyers say in a case is not evidence. We presume that juries follow the instructions given to them. United States v. Siegelman, 640 F.3d 1159, 1184 (11th Cir. 2011); United States v. Almanzar, 634 F.3d 1214, 1223 (11th Cir. 2011); cf. United States v. Bailey, 123 F.3d 1381, 1402 (11th Cir. 1997) ("[A]ny possible prejudice to [the defendant] resulting from the

30

prosecutor's closing argument was cured by instructions from the district judge that the lawyers' arguments were not evidence . . . .").

Varela and Lopez have not convinced us that any out-of-court statements by Sanchez or Troya implicating Varela and Lopez were admitted into evidence during the joint trial that would not have been admissible if they all had been tried separately. The only statement that Varela and Lopez point to came in when Melvin Fernandez, a longtime friend of Troya, testified that days after Escobedo was killed and his house pillaged, Troya had bragged about robbing (or "licking") someone for 15 kilos of cocaine. Because Troya was Varela's and Lopez's coconspirator in the drug-distribution conspiracy, however, his out-of-court statement would have been admissible against them even if they had not been tried with Troya. See Fed. R. Evid. 801(d)(2)(E).

Troya made that statement to Fernandez "during the course and in furtherance of the conspiracy" to sell drugs. Id. It was made during the course of the conspiracy because the four coconspirators were still selling drugs. It was made in furtherance of the conspiracy because it let potential customers or fellow drug dealers know that the conspirators had cocaine to sell. See United States v. Flores, 572 F.3d 1254, 1264 (11th Cir. 2009) ("The statement need not be necessary to the conspiracy, but must only further the interests of the conspiracy in

31

some way.").  And admission of the statement did not violate the Confrontation Clause because bragging to a friend about the fruits of a robbery is not testimonial. See Crawford v. Washington, 541 U.S. 36, 51, 124 S.Ct. 1354, 1364 (2004) ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.").[10]

The best argument that Varela and Lopez have that a severance should have been granted is that the joint trial brought into evidence the fact that two of their coconspirators had murdered a fellow drug dealer, his wife, and their two young children.  There were autopsy reports and photographs of the dead, bullet-riddled victims and testimony about how they were killed.  No defendants would want that evidence to come before the jury at their trial, even if it were made clear that they

---

[10] In arguing that Troya's out-of-court statement was inadmissible against him, Varela points out that the district court instructed the jury that the statement should be considered only against Troya. That jury instruction was given at the request of defendants other than Troya and without objection from the government.  Just because the court gave the instruction does not mean that if the evidence had been offered at a separate trial of Varela and Lopez, the court would have been required to keep it out.  For the reasons discussed in the text of this opinion, the statement would have been admissible.

did not participate in the murders.[11]  What defendants want, however, is not the test.  See supra Parts III.A. & B.

In gauging the prejudicial effect and the spillover risk posed by the evidence about the murders, it is important to keep in mind that the district court repeatedly instructed the jury to consider evidence against only those defendants that the evidence implicated and to assess the guilt or innocence of each defendant separately.  For example, in its final instructions the court stressed to the jury that:

> In reaching a verdict as to counts related to more than one Defendant, you must evaluate the evidence independently as to each Defendant.
>
> Remember at the outset we talked about the fact [that] for reasons of judicial economy, we really put four trials together.  Remember I said how important it was that as the jury looks at the evidence, you need to look at the evidence in terms of one Defendant all by themselves.  You make your decision and then put that aside and move on to the next person.  Okay?
>
> So it is terribly important that each person be evaluated all by themselves, and whatever judgment you make on one person, it should not affect your judgment as to another person.

---

[11] There was no evidence that Lopez had anything to do with the murders.  There was also no evidence that Varela was present when the murders were committed and no direct evidence that he orchestrated them.  But there was some circumstantial evidence from which it could be inferred that Varela was at least aware of the murders soon after they happened.  Cell phone records showed calls both ways between Varela's phone and Sanchez's phone on the evening of the murders as Sanchez and Troya traveled along the Florida coast, and those records showed that both Sanchez's and Troya's phones called Varela's phone less than five minutes after a couple living near the murder scene heard gunshots. The evidence at trial also pointed to Varela as the leader of the gang.

And it also instructed the jury that:

I know that each one of you knows this already because we've talked about it several times, but it is so important, I want to make sure you understand that a separate crime or offense is charged against one or more of the Defendants in each count of the indictment. Each charge and the evidence pertaining to it should be considered separately. Also, the case of each Defendant should be considered separately and individually.

The fact that you may find any one or more of the Defendants guilty or not guilty of that offense charged should not affect your verdict as to any other offense or any other Defendant.

Remember we talked about this repeatedly. You want to take each Defendant one by one and the charge as it pertains to that Defendant. Make up your mind, set that aside, and move on to the next person and don't let your decision on the first person decide how you come out as to the second.

And the court gave similar instructions several other times during the trial.

In one phrasing or another the court gave cautionary instructions once to the entire venire, once or twice to each of the 18 venire panels,[12] a few times during trial for

---

[12] For example, after noting that "four separate cases" have been brought together, the district court asked a venire panel:

Can everyone assure each one of these Defendants that even though we are having a joint trial, that you will look at the evidence only as to that Defendant individually, and you will make up your mind on that Defendant all by themselves irrespective of the fact that we have had this, and are going to have this joint trial?

Now, Mr. Troya and Mr. Sanchez have charges, as you know, that at least have the potential of some very serious death penalty or life imprisonment without the potential of release.

Mr. Varela and Ms. Lopez do not.

34

specific testimonial evidence,[13] and four more times in its final instructions.  <u>See</u>

> I want to make sure the jury will look at each Defendant, Mr. Troya all by himself, Mr. Sanchez all by himself, Ms. Lopez all by herself, and Mr. Varela all by himself.
>
> Can everybody do that?
>
> Does anybody have a problem in that regard?
>
> Okay.

[13] For example, in instructing the jury on how it could use the testimonial evidence from Melvin Fernandez regarding the boastful statements that Troya made to him about his recent robbery, the district court stated:

> Now, whether that testimony is believable, that is a question of fact that you, the jury, have to decide, but I wanted to make sure that you understood that if the jury were to find that Mr. Fernandez's testimony was in fact believable with respect to what he said Mr. Troya told him, that that evidence would only be admissible against Mr. Troya, and that evidence would not be admissible against any other Defendant in the case.
>
> Remember I said at the very beginning when we were talking about the fact that what we really have in this case are four separate trials, and the case has been brought together, really, because of issues of judicial economy.
>
> So sometimes it is possible that evidence might come in and -- but it would only be purposeful or usable as to a particular Defendant.  So in a sense there is a two step analysis there.
>
> The first part would be is the witness believable.
>
> If the witness were not believable, obviously you don't use the testimony at all.  If you found that the witness, Mr. Fernandez, was believable in whole or in part, that testimony could only be used with respect to the charges pending against Mr. Troya and no other Defendant.
>
> Okay.  Everybody understand that?
>
> All right.  Fine.

United States v. Hill, ___ F.3d ___, 2011 WL 2314155, *10 (11th Cir. 2011) (rejecting a severance contention where "[a]lthough the district court, in the interests of efficiency and judicial economy, understandably refused to give the jury a curative instruction every time evidence irrelevant to the charges against [the appellant] was introduced, the court did give the jury a closing instruction that it must consider the evidence separately as to each defendant with respect to each charge."); United States v. McNair, 605 F.3d 1152, 1205 n.73 (11th Cir. 2010) (noting that jury instructions, such as those in which the district court "charged the jury to consider each defendant 'separately and individually' and reminded them that 'each defendant is on trial only for the specific offenses or offense charged against such defendant in the indictment[,]' . . . substantially mitigate the risk of spillover prejudice."); United States v. Cross, 928 F.2d 1030, 1039 (11th Cir. 1991) (finding no prejudicial effect from spillover evidence where "the trial court specifically charged the jury that, 'each offense and the evidence pertaining to it should be considered separately,' and that 'the case of each defendant should be considered separately and individually.'"); United States v. Smith, 918 F.2d 1501, 1510 (11th Cir. 1990) ("The possible prejudicial effects of such disparity can be significantly alleviated if the trial judge is careful to instruct the jury that it must

consider the evidence against each defendant on a separate and independent basis.").

The other factor that persuades us that the introduction of the evidence proving that Sanchez and Troya murdered the Escobedos did not prevent the jury from reliably determining the guilt of Varela and Lopez on the charges against them is the nature and extent of evidence proving Varela and Lopez were guilty of those charges. In making a prejudice determination of this type, we do not analyze spillover evidence in a vacuum but consider it against the strength of the evidence proving the guilt of the defendant on the charges against him. See Blankenship, 382 F.3d at 1123; United States v. Diaz, 248 F.3d 1065, 1101 (11th Cir. 2001) (finding no compelling prejudice from spillover where "the evidence against [the defendant] . . . was more than overwhelming"); United States v. Howell, 664 F.2d 101, 106 (5th Cir. Unit B 1981) (finding no compelling prejudice where "[t]he evidence of [defendant's] guilt . . . was so overwhelming that there is no reason to conclude that [the spillover] evidence prevented a fair trial."); see also United States v. Pedrick, 181 F.3d 1264, 1267–72 (11th Cir. 1999) (comparing the "overwhelming" evidence against one codefendant to the "minimal" evidence against the second codefendant to find that the district court did not abuse its discretion in determining that the second defendant suffered compelling

37

prejudice); United States v. Hernandez, 921 F.2d at 1580 ("Were the evidence of guilt of either defendant more clear, the prejudicial effect of their combined trial would be less compelling.").

The government presented compelling evidence of Varela's guilt, such as: direct testimony from eyewitnesses, including people who bought cocaine from him during the course of the conspiracy; physical evidence of cocaine, tools of the drug trade, and firearms he possessed illegally; uncontradicted proof of a controlled buy where an informant bought a kilo of cocaine directly from Varela; and lots of other evidence of Varela's involvement with and leadership role in the gang's drug dealing activities from May to October 2006. In light of all of that evidence, and in view of the cautionary instructions that the court gave, we are convinced that the jury was able to and, after three days of deliberation, did reliably determine the guilt of Varela and the charges against him. See Hernandez, 921 F.2d at 1581 (holding that the defendants had not shown any compelling prejudice in part because the trial was not "concluded by jury deliberations that were inordinately hurried"); cf. Pedrick, 181 F.3d at 1273 (noting as evidence of compelling prejudice that "[t]he jury deliberated for only about three hours").

The same is true of Lopez. She, too, benefitted from all of the cautionary instructions, and there was strong evidence to support her convictions. The

38

evidence proved beyond any reasonable doubt that in her role as a conspirator she stuffed kilograms of cocaine into bean bags, she took and filled orders for illegal drugs, she delivered large quantities of drugs, she collected money from those who had purchased drugs on credit, she carried weapons to thwart robberies of the Pimp Plaza by competing gangs, and she took part in trying to remove the drugs and weapons from the Thug Mansion when word reached the conspirators that law enforcement was closing in. In addition, authorities caught Lopez red-handed, or perhaps we should say "white-handed," carrying two kilos of cocaine powder and $14,000 cash while making rounds for Varela. This is not one of those cases where "the gruesome evidence against one defendant overwhelms the de minimus evidence against the co-defendant[]." Blankenship, 382 F.3d at 1123 (alteration omitted). We are confident that Lopez's guilt was reliably determined and that she was convicted, not because of any spillover effect from the evidence about the murders that Sachez and Troya committed, but as a result of the evidence against her.

For all of these reasons, the district court did not abuse its discretion by denying Varela's and Lopez's motions for severance of the charges against them and proceeding with a joint trial of all four conspirators who resided in the Thug Mansion, including Varela and Lopez.

39

IV.

Rule 14 gives district courts discretion not only to sever all the charges against a given defendant or defendants but also to sever individual charges against a given defendant. Fed. R. Crim. P. 14(a) ("If the joinder of offenses . . . in an indictment . . . appears to prejudice a defendant . . . , the court may order separate trials of counts . . . or provide any other relief that justice requires."). Varela contends the district court abused its discretion by denying his motion to sever the § 922(g) felon-in-possession gun charges against him from the other charges he faced. He argues that he was severely prejudiced when the jury heard that he was a convicted felon, especially because it also heard about his association with Sanchez and Troya, who were charged with carjacking and murder.

As an initial matter, this Court has long recognized that, as Forrest Gump might say, drugs and guns go together like peas and carrots. See e.g., United States v. Hromada, 49 F.3d 685, 689 (11th Cir. 1995) ("Guns and violence go hand-in-hand with illegal drug operations."); United States v. Martin, 794 F.2d 1531, 1533 (11th Cir. 1986) (noting that guns "are 'tools of the trade' in drug trafficking"). If every defendant charged with illegal drug activities were entitled

40

to be tried separately on any felon-in-possession charge, separate trials would eat up a lot more scarce judicial resources.

In United States v. Jiminez, 983 F.2d 1020 (11th Cir. 1993), we held that a district court did not abuse its discretion by denying a motion to sever a felon-in-possession firearm charge from a drug charge under § 841(a)(1). Jiminez, 983 F.2d at 1022; see also United States v. Dowd, 451 F.3d 1244, 1250 (11th Cir. 2006); United States v. Miller, 255 F.3d 1282, 1289 (11th Cir. 2001). We found no reversible error in Jiminez because the prior conviction had not been unduly emphasized and the court had instructed the jury not to consider it in connection with any other issues. Jiminez, 983 F.2d at 1023; see also Dowd, 451 F.3d at 1250 ("[B]ecause the parties stipulated to [the defendant's] status as a convicted felon, the jury heard no details about [his] prior criminal activity, and his criminal past was barely mentioned at trial and was in no way emphasized."); Miller, 255 F.3d at 1289 ("[P]rejudice was mitigated by the fact that at trial he stipulated to his conviction."). We also found that ample evidence supported guilt on the other counts. Jiminez, 983 F.2d at 1023; see also Dowd, 451 F.3d at 1250 ("More importantly, the evidence presented of [the defendant's] guilt in the robbery was extensive and overwhelming."); Stone v. Green, 796 F.2d 1366, 1368 (11th Cir. 1986) (finding that any error in admitting the defendant's prior drug conviction

was harmless even though the district court gave no limiting instruction because evidence of guilt was so overwhelming). The same is true here.

In this case all the jury heard about the prior conviction was a bare-bones stipulation that Varela had an earlier felony conviction. It was not told any of the details of that conviction, not even the crime involved. See Dowd, 451 F.3d at 1250; Miller, 255 F.3d at 1289; see also Old Chief v. United States, 519 U.S. 172, 190–91, 117 S.Ct. 644, 655 (1997) ("The most the jury needs to know is that the conviction admitted by the defendant falls within the class of crimes that Congress thought should bar a convict from possessing a gun, and this point may be made readily [by the parties' stipulation] and underscored in the court's jury instructions."). And the district court instructed the jury not to consider that earlier conviction in relation to any other charge. To the extent that it matters, as we have already discussed, there was also overwhelming evidence of Varela's guilt of the charges on which he was convicted. See Dowd, 451 F.3d at 1250; Jiminez, 983 F.2d at 1023. For all of these reasons, the district court did not abuse its discretion in denying Varela's motion to sever the felon-in-possession charges against him from the other charges.

V.

The district court required all four of the defendants to agree on the exercise of any of the peremptory challenges that were allotted to the defense side. Varela contends that requiring unanimous consent before a potential juror could be struck was an abuse of discretion.

Federal Rule of Criminal Procedure 24(b) provides 20 peremptory challenges for defendants in a capital case and 10 challenges in other felony cases. Fed. R. Crim. P. 24(b)(1)–(2). The district court, in its discretion, "may allow additional peremptory challenges to multiple defendants, and may allow the defendants to exercise those challenges separately or jointly." Id. The exercise of peremptory challenges is a statutory- or rule-based right, and is "not of federal constitutional dimension." United States v. Martinez-Salazar, 528 U.S. 304, 311, 120 S.Ct. 774, 779 (2000). The district court is not required to give the defense side any extra peremptory challenges in multiple defendant trials. Stilson v. United States, 250 U.S. 583, 586–87, 40 S.Ct. 28, 29–30 (1919).

In this case the district court allowed the four codefendants a total of 20 peremptory challenges for selecting the first 12 jurors. The court also gave the defendants the option for 4 more peremptory challenges to be exercised

individually, instead of jointly, if they would agree to the government also having 4 more. The defendants, by majority vote, declined that offer.[14]

The district court required the defendants to exercise their peremptory challenges jointly through a unanimous vote. Because the rule plainly provides that "[t]he court . . . may allow the defendants to exercise those challenges separately or jointly," see Fed. R. Crim. P. 24(b) (emphasis added), Varela concedes that the court could have conditioned the exercise of any peremptory challenge on a majority vote of the defendants. He argues, however, that requiring unanimous consent was an abuse of discretion, especially because there was what he characterizes as an inherent conflict of interest between the capital and non-capital defendants, making it difficult for them to all agree on which potential jurors to challenge. Difficult or not, it seems that the defendants did unanimously agree to a considerable extent because they jointly exercised 8 of the 20 strikes they were allotted to select the first 12 jurors, just as the government exercised 8 of the 20 it was given.[15]

---

[14] Varela would have accepted the court's offer, even at the cost of the government getting extra challenges, but the other three defendants rejected it. The result was that neither side got any additional challenges.

[15] For use in selecting the 6 alternates, the court gave each side three more peremptory challenges and also allowed use of any challenges left over from selecting the first 12 jurors. See Fed. R. Crim. P. 24(c)(4)(C). The defendants jointly exercised 6 more challenges and the government 3 more to select the alternates. Considering the entire selection process, the defendants were able to unanimously agree upon and did use 14 peremptory challenges, while the

In any event, Varela's concession that it would have been permissible for the district court to condition defense challenges on the agreement of a majority of the defendants dooms his conflict-of-interest argument. If the capital charges did create a conflict of interest, the conflict was between the two capitally charged defendants on one side and the two non-capitally charged defendants on the other. Because a majority of four is three, the defendants on either side of the presumed capital divide could not have removed a potential juror without the consent of at least one of the two defendants on the other side of that divide. That one defendant on the other side of the divide, according to Varela, would have had a conflict of interest with the defendants wanting to exercise the challenge. So, the asserted conflict of interest still would have existed under the procedure that Varela concedes is permissible under Rule 24(b).[16]

Varela's argument has been rejected in the Second Circuit. See United States v. Aloi, 511 F.2d 585, 598 (2d Cir. 1975) (holding that the district court did not abuse its discretion in requiring that peremptory challenges be exercised

government used only 11.

[16] Our reasoning is illustrated by what actually happened. During jury selection, Varela and Lopez objected only to their inability to strike 3 panel members (2 jurors and 1 alternate juror). That inability resulted from split votes—Varela and Lopez voted to exercise a challenge on those jurors and Sanchez and Troya voted against it. The unanimity requirement did not prevent Varela and Lopez from exercising those three challenges. They would also have been unable to exercise them if the court had required only a majority vote, which Varela concedes it could have done under Rule 24(b).

unanimously, despite differences in culpability and notoriety among the codefendants). Our predecessor court, too, has approved the requirement of unanimous consent for the exercise of peremptory challenges in multi-defendant cases.  See United States v. Hooper, 575 F.2d 496, 498 (5th Cir. 1978).  In Hooper, the Court explained:

> Defendant also claims that there was a conflict of interest between the two defendants, and that the "dilution" of the peremptory challenges by requiring the defendants to jointly exercise the challenges was therefore prejudicial.  We are unconvinced by defendant's reasoning.

Id.  That decision is binding precedent, although as Varela points out, it involved only two defendants, not a number in which the difference between a majority vote and a unanimous one could have mattered.

Other courts have concluded that it is not improper to require two disagreeing codefendants to agree on the exercise of any peremptory challenges. See United States v. McClendon, 782 F.2d 785, 788 (9th Cir. 1986) ("Disagreement between codefendants on the exercise of joint peremptory challenges does not mandate a grant of additional challenges unless defendants demonstrate that the jury ultimately selected is not impartial or representative of the community."); United States v. Williams, 463 F.2d 393, 395 (10th Cir. 1972) (finding no abuse of discretion where the district court limited two disagreeing codefendants to ten joint peremptory challenges).

For all these reasons, we are convinced that the district court did not abuse its discretion by requiring that all four of the defendants agree on the exercise of any peremptory challenges.

VI.

Varela contends that the district court erred in denying his motion to suppress the results of the October 25 search of the Thug Mansion. In his motion to suppress Varela argued, as he does here, that the part of the affidavit describing the controlled buy was "fatally defective" in several respects. And he contends that without the part of the affidavit recounting the controlled buy, there were insufficient facts to provide probable cause for the search.

The magistrate judge who presided over the suppression hearing assumed the first premise of Varela's argument: because the part of the affidavit concerning the controlled buy was "fatally defective," that part of the affidavit should not be considered. But the magistrate judge rejected the argument's second premise and found that the rest of the affidavit "sets forth sufficient facts to lead a detached and neutral judge to conclude that there was a fair probability that evidence of first degree murder would be found" at the Thug Mansion. The district court adopted the magistrate's report and recommendation and denied Varela's motion to suppress.

47

We review de novo whether the facts set forth in an affidavit constitute a sufficient basis for a finding of probable cause. United States v. Kapordelis, 569 F.3d 1291, 1308 (11th Cir. 2009). We must, however, "take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Id. at 1308–09. A sufficient basis for "[p]robable cause for a search exists when under the totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Magluta, 418 F.3d 1166, 1182 (11th Cir. 2005) (quotation marks omitted) (quoting United States v. Goddard, 312 F.3d 1360, 1363 (11th Cir. 2002)). A "fair probability," in turn exists when the facts and circumstances would lead a reasonably prudent person to believe that the place to be searched contains contraband or evidence of a crime. See United States v. Alexander, 835 F.2d 1406, 1409 (11th Cir. 1988). The connection between the objects to be seized and the premises to be searched can be established "from the particular circumstances involved and need not rest on direct observation." United States v. Tate, 586 F.3d 936, 943 (11th Cir. 2009) (quotation marks omitted).

Making the same assumption in Varela's favor as the magistrate judge and district court did, and subtracting out the part of the affidavit about the controlled

buy, we also conclude, as they did, that the remaining parts of it supplied probable cause to support the search. Varela's argument focuses on the failure of the affidavit to connect him to the Escobedo murders, but that is not the connection that matters. What matters is the connection between the murders and the place to be searched, the Thug Mansion. Varela could be as innocent of the murders as Snow White and there still be probable cause to believe that the house he shared with several others contained evidence of those crimes. And there was probable cause to believe that.

The affidavit described how officers observed a burgundy van at the Thug Mansion that was "identical" to the one caught on camera entering the Florida Turnpike along with Escobedo's Jeep minutes before Escobedo and his family were shot, and exiting the turnpike along with Escobedo's Jeep minutes after the Escobedos were left dead on the side of the road. It stated that Varela had also been seen driving a "dark colored conversion van." It told how Troya's and Sanchez's palm prints had been found on the toll tickets used by the drivers of the burgundy van and the Escobedo's Jeep to exit off of the turnpike after the Escobedos were killed, and how a ledger found at Escobedo's house indicated transactions with "D.V.," Varela's alias. The affidavit also recounted how witnesses had connected Varela and Escobedo and their drug dealings, how the

two of them had recently argued about missing drug trafficking money, and how officers, after initiating 24-hour surveillance on the Thug Mansion on October 21, 2006, had "positively identified" Troya, Varela, and Sanchez as residing there, and observed them staying at the house on three consecutive nights. We agree with the warrant-issuing judge, and the magistrate judge, and the district court judge that the facts set forth in the affidavit would lead a reasonably prudent person to believe that the Thug Mansion contained evidence of the murder of the Escobedo family.

Varela points out that although the murders occurred on October 13, 2006, the search did not take place until October 25. He argues that the delay implies that the officers did not believe they had enough evidence before the controlled buy and needed the controlled buy for probable cause. That argument is beside the point because probable cause is determined by an objective standard, and the subjective beliefs of the officers are irrelevant. United States v. Lanzon, 639 F.3d 1293, 1300 (11th Cir. 2011) ("A police officer's subjective reasons for a search do not control the legal justification for his actions, as long as objective circumstances justify the search." (citing Scott v. United States, 436 U.S. 128, 136–37, 98 S.Ct. 1717, 1723 (1978)); United States v. Street, 472 F.3d 1298, 1305

50

(11th Cir. 2006) ("The officer's own subjective opinions or beliefs about probable cause are irrelevant, because it is an objective standard.").

More to the point, Varela argues for the first time in his reply brief to this Court that the execution of the warrant 12 days later —he says "17 days later" but has miscounted—means any probable cause that might have existed earlier had faded away. We disagree for two reasons, one procedural and one on the merits. Procedurally, Varela did not raise the argument about the 12-day time lapse between the murders and the search until his reply brief to this Court. In this circuit, "[t]hat is too late." Atwater v. Nat'l Football League Players Ass'n, 626 F.3d 1170, 1177 (11th Cir. 2010); Conn. State Dental Ass'n v. Anthem Health Plans, Inc., 591 F.3d 1337, 1351 n.11 (11th Cir. 2009) ("Because they raised this argument for the first time in their reply brief, we treat this argument as waived."); United States v. Evans, 473 F.3d 1115, 1120 (11th Cir. 2006) ("[A]rguments raised for the first time in a reply brief are not properly before a reviewing court.").

Second, even if the contention had not been waived, there is no merit to it. It is true that "the information supporting the government's application for a warrant must show that probable cause exists at the time the warrant issues." United States v. Bervaldi, 226 F.3d 1256, 1264 (11th Cir. 2000). In other words,

51

it cannot be stale.  But there is no mathematical measure for when freshness fades away and staleness sets in.  See United States v. Harris, 20 F.3d 445, 450 (11th Cir. 1994) ("When reviewing staleness challenges we do not apply some talismanic rule which establishes arbitrary time limitations."); United States v. Bascaro, 742 F.2d 1335, 1345 (11th Cir.1984) ("No mechanical test exists for determining when information becomes fatally stale.") abrogated on other grounds United States v. Lewis, 492 F.3d 1219, 1221–22 (11th Cir. 2007) (en banc).  Instead, "'staleness is an issue which must be decided on the peculiar facts of each case.'"  Bervaldi, 226 F.3d at 1265 (quoting Bascaro, 742 F.2d at 1345).  "The length of time between the date on which all of the facts supporting probable cause were known and the date the warrant was issued is . . . one factor."  United States v. Domme, 753 F.2d 950, 953 (11th Cir. 1985).

The murders, each of which involved multiple gunshot wounds from close range, occurred on October 13, 2006.  No guns were found at the side of the road where the Escobedo family was murdered.  Witnesses saw the same burgundy van that was caught on Florida Turnpike cameras on the night of the murders at the Thug Mansion on October 17, 2006. On October 19 the officers found out from latent palm prints on tollbooth tickets that Troya was on the turnpike in the burgundy van at the time of the murders.  And on October 21 the officers

determined from palm prints on a different tollbooth ticket that Sanchez had been on the turnpike driving the murder victims' car minutes after they were killed. When the officers began conducting surveillance on the Thug Mansion on October 21, 2006, they observed Sanchez and Troya—two individuals directly connected to the scene of the bloody Escobedo murders—staying overnight at the house every night leading up to the day the house was searched. The killings were brutal and bloody, the murder weapons were not left at the scene, the van that was at the murder scene was seen at the Thug Mansion, and the suspected killers were residing at that house. A less-than-a-fortnight time lapse between the murders and the search and only a few days lapse from the time the officers learned that Troya and Sanchez were at the murder scene and were living at the Thug Mansion would not prevent a person of reasonable prudence from believing that evidence of the Escobedo murders would be found at there.

## VII.

Varela also contends that the district court abused its discretion by allowing his former cocaine customers Mullino and Calderon to testify about their dealings with him. The court admitted the evidence for two reasons. One was that it was evidence of the crime charged, or was inextricably intertwined with the evidence of the charged offenses and necessary to complete the story of the crimes. The

53

other reason was that the evidence was admissible under Federal Rule of Evidence 404(b). Varela does not appear to contest the admissibility of the evidence under either of those theories. Instead, he argues that the evidence was unfairly prejudicial and the court should have excluded it for that reason under Federal Rule of Evidence 403.

Rule 403 gives the district court discretion to exclude otherwise relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. Varela says that Mullino's and Calderon's testimony about his other bad acts was unduly prejudicial and that Calderon's testimony was cumulative of Mullino's. Varela also argues that the probative value of both witnesses' testimony as it pertains to his intent should be discounted because the government had extensive testimony and evidence from other witnesses.

Rule 403 "is an extraordinary remedy which the district court should invoke sparingly, and the balance should be struck in favor of admissibility." United States v. Alfaro-Moncada, 607 F.3d 720, 734 (11th Cir. 2010) (quoting United States v. Dodds, 347 F.3d 893, 897 (11th Cir. 2003)). Rule 403 requires a court to "look at the evidence in a light most favorable to its admission, maximizing its

54

probative value and minimizing its undue prejudicial impact." Id. Not only that, but the decision calls for weighing competing considerations, and the balance to be struck is largely committed to the discretion of the district court, which has far more experience in evidentiary matters and is better equipped to decide them than an appellate court. United States v. Bradberry, 466 F.3d 1249, 1253 (11th Cir. 2006) ("Close questions of admissibility under Rule 403 give rise to the abuse of discretion standard of review and fall squarely within the ambit of the district court's sound discretion." (quotation marks omitted)); United States v. Jernigan, 341 F.3d 1273, 1285 (11th Cir. 2003) ("Inherent in this standard is the firm recognition that there are difficult evidentiary rulings that turn on matters uniquely within the purview of the district court, which has first-hand access to documentary evidence and is physically proximate to testifying witnesses and the jury.").

For those reasons, we will find that the district court abused its discretion under Rule 403 in only the rarest of situations. Jernigan, 341 F.3d at 1285 ("[T]he district court is uniquely situated to make nuanced judgments on questions that require the careful balancing of fact-specific concepts like probativeness and prejudice, and we are loath to disturb the sound exercise of its discretion in these areas."); see also Bradberry, 466 F.3d at 1253 ("Only if the decision to admit

evidence over a Rule 403 challenge is unsupportable when the evidence is viewed in the light most supportive of the decision will we say that the decision constitutes an abuse of discretion."). This is not one of those rarest of situations.

The indictment charged Varela with conspiring to possess with intent to distribute cocaine and crack cocaine from May 2006 to October 2006. In part of his testimony Calderon recounted how Varela sold him cocaine up until the time of Calderon's arrest in July 2006. That part of Calderon's testimony was prejudicial only because it was direct evidence that Varela had committed the crime with which he was charged, and direct evidence of guilt may not be excluded under Rule 403.

To the extent Calderon's testimony involved his drug dealings with Varela before May 2006, the date the indictment charged that the conspiracy began, that part of his testimony showed his relationship with Varela when the conspiracy began and how they came to be trading together in large amounts of cocaine during the course of the conspiracy. The testimony provides context. The district court was well within its discretionary bounds when it found that the probative value of that testimony substantially outweighed any prejudice resulting from it.

Mullino's testimony also easily clears the low bar set for reviewing Rule 403 rulings. The testimony Mullino gave about Varela selling him drugs from the

56

middle of 2005 to March or April of 2006 had high probative value because of the context it provided for the controlled buy. Without evidence about Varela's past drug dealings with Mullino, it might be difficult to believe that Mullino could simply call up Varela out of the blue and set up the purchase of a half kilo of cocaine. And without evidence of their past dealings it would be even more difficult to believe that Varela would front Mullino an additional half kilo of cocaine, trusting him to settle the debt at a later date. The fact that they had illegal drug transactions in the past made both of those actions not only believable but also understandable. The district court did not abuse its discretion in refusing to keep out Mullino's testimony under Rule 403.

## VIII.

Varela was convicted in this case of his fourth, fifth, sixth, and seventh felony drug convictions and was sentenced to "life imprisonment without release" under 21 U.S.C. § 841(b)(1)(A), which requires that sentence for a defendant convicted of a drug felony under § 841 after two or more of his earlier felony drug convictions have become final. See 21 U.S.C. § 841(b)(1)(A). Varela contends that the mandatory sentence of life imprisonment that § 841(b)(1)(A) provides violates the Eighth Amendment's Cruel and Unusual Punishments Clause. In United States v. Willis, 956 F.2d 248, 251 (11th Cir. 1992), we held that it did not.

57

**AFFIRMED.**