[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-10261
_____

D.C. Docket No. 8:14-cr-00379-CEH-TGW-5

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JESUS HERNANDO ANGULO MOSQUERA,
JUAN RODRIGUEZ ACOSTA,
ARLEY LOPEZ ENCISO,
EFRAIN BILBAO VARELA,

Defendants - Appellants.

_____

No. 16-10313
_____

D.C. Docket No.  8:14-cr-00379-CEH-TGW-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JUAN RODRIGUEZ ACOSTA,

Defendant - Appellant.

_____

No. 16-10381

_____

D.C. Docket No.  8:14-cr-00379-CEH-TGW-6

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

ARLEY LOPEZ ENCISO,

Defendant - Appellant.

_____

No. 16-10414

_____

D.C. Docket No.  8:14-cr-00379-CEH-TGW-4

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

EFRAIN BILBAO VARELA,

2

Defendant - Appellant.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(March 30, 2018)

Before MARCUS, MARTIN, and NEWSOM, Circuit Judges.

MARCUS, Circuit Judge:

In this large cocaine conspiracy, the appellants, Jesus Hernando Angulo-Mosquera ("Angulo"), Juan Rodriguez-Acosta ("Acosta"), Efrain Bilbao-Varela ("Varela"), and Arley Lopez-Enciso ("Lopez"), were charged, along with four other co-conspirators, with conspiring to possess and possessing cocaine with intent to distribute while aboard a vessel on the high seas and subject to United States jurisdiction. Before trial the four other co-conspirators pled guilty, and at trial they testified that all of the appellants knew there were drugs on the vessel they sailed and all were knowing participants in the conspiracy. Angulo, alone among the appellants, testified in his own defense. Each of the appellants was convicted by the jury and each was sentenced to a 235-month prison term.

The appellants argue that the district court's denial of their motions for a new trial amounted to an abuse of the district court's discretion because polygraph evidence offered by Angulo in support of his claimed lack of knowledge

3

prejudiced the remaining appellants in a joint trial and should have resulted in severance. They also claim that the prosecutor improperly cross-examined Angulo, that the district court erroneously allowed the introduction of hearsay evidence, and that the court erred in not including a particular jury instruction sought by Acosta, Varela, and Lopez. Finally, Varela and Acosta contest their sentences.

We can discern no error, and, accordingly, affirm the judgments of the district court.

## I.

Angulo, Acosta, Varela, and Lopez were part of an eight-member crew on board the Hope II, a Panamanian-flagged cargo ship that departed from Cartagena, Colombia in August 2014 laden with nearly 1500 kilograms of cocaine secreted in a hidden compartment. The other four crewmembers were Simon Bolivar Ferreras-Trinidad, Euclides Tous-Calle, Manuel DeJesus Crespo-Marin, and Emerson Julio Carcedo.

Three of the appellants -- Acosta, Varela, and Angulo -- had been working on the Hope II for several months before the Coast Guard intercepted the vessel. Acosta was the ship's captain, Varela was its chief engineer, and Angulo claims to have been the cook. One of the co-conspirators, Crespo-Marin, testified that the August 2014 voyage was not the Hope II's first drug run. Rather, the Hope II had

4

sailed with cocaine at least one other time in February 2014, and according to Crespo-Marin, the entire crew for that voyage, including Acosta, Varela, and Angulo, had been involved in the drug conspiracy. Prior to that run, a secret compartment to house the drugs was built inside a fuel tank beneath the hallway outside the crew's cabins.

While the Hope II was undergoing repairs after the first run, the crew was told about an opportunity to participate in another drug run with about twice the cargo of cocaine; each crewmember would net between 50 and 120 million pesos for undertaking the task. Ferreras-Trinidad testified that everyone, including the four appellants, agreed to take part in the enterprise. Ferreras-Trinidad and Tous-Calle added that Angulo used the ship's crane to load some 61 boxes of cocaine onto the Hope II while Varela directed him from the deck, and Ferreras-Trinidad testified that Lopez detached the boxes from the crane when they got to the ship. The crew also stored some empty rice bags in the steering room -- a type of bag often used to facilitate the delivery of drugs.

On August 28, 2014, a maritime patrol aircraft spotted the Hope II traveling in an area of "known drug-smuggling activity" some 47 nautical miles north of San Blas, Panama. The aircraft reported to a Coast Guard ship that it had encountered a vessel acting in a suspicious manner: the ship was seen changing course as soon as the aircraft approached, and its automated information system -- which

5

broadcasts the ship's last port of call, next port of call, and purpose -- was not active. A Coast Guard cutter hailed the Hope II and ultimately boarded it. Co-conspirator Tous-Calle testified that not long before the Hope II was boarded, Acosta tried to call someone on a satellite phone and ordered Tous-Calle to throw the phone overboard when the call did not go through "[s]o that it would not be seized."

Six Coast Guard personnel boarded the ship and began to conduct a safety sweep. They asked the captain, Acosta, to muster the crew on deck, and to produce documentation for the ship and its crew, along with the crew's passports. The Coast Guard then conducted an "at-sea space accountability" inspection -- a visual inspection of "every single square inch of the vessel" to look for hidden compartments and drugs. They discovered the empty rice bags in the steering room, which added to their suspicions, because this kind of bag is often associated with contraband. Coast Guard personnel also discovered that the ship's automated information system worked but had been switched off. During the inspection, co-conspirator Carcedo overheard Varela warn Acosta that the Coast Guard was "right on top of the secret compartment."

The Coast Guard eventually found a hatch in the middle of the berthing area hallway that had been covered by two mats: a black rubber mat placed on top and a "welcome" mat found underneath. Coast Guard personnel assumed the hatch led

6

to a fuel hold, but one officer became suspicious because of its unusual location near the berthing area.  Closer inspection revealed other oddities: the hatch was not airtight, which is highly unusual for a fuel hold; some of the bolts holding the hatch closed were shiny, indicating they had been manipulated recently; and there was caulking discerned around the access plate, which is not typically used for a fuel hold.  The officer opened the hatch just a little bit to see if he could smell any fuel.  Once he determined that he could not, he opened the hatch fully.  Inside, the Coast Guard found 1483 kilograms of cocaine.  Ion scans of the ship also revealed trace amounts of cocaine on the crane and in the galley area of the ship.

The crew was arrested, brought to Tampa, and each was indicted in the United States District Court for the Middle District of Florida for possessing cocaine with the intent to distribute while aboard a vessel subject to United States jurisdiction, under 46 U.S.C. §§ 70503(a) and 70506(a), and 21 U.S.C. § 960(b)(1)(B); and for conspiracy to possess cocaine with the intent to distribute, under 46 U.S.C. §§ 70503(a) and 70506(a)–(b), and 21 U.S.C. § 960(b)(1)(B)).

Four of the co-conspirators -- Ferreras-Trinidad, Tous-Calle, Crespo-Marin, and Carcedo -- pled guilty.  One of them, Crespo-Marin, testified that after pleading guilty and returning to the holding area, Angulo came up to him and they had "a verbal fight."  Angulo allegedly called Crespo-Marin a traitor, which Crespo-Marin took to be a reference to his decision to plead guilty.  According to

Crespo-Marin, Angulo also said "that he [Angulo] was a man that demanded respect," and then Angulo threatened him by saying "[y]ou don't know who I am." Another co-conspirator, Ferreras-Trinidad, testified that Angulo and Varela "threatened to kill [him] 50 times over," observing "that [he] know[s] how [pleading guilty] is rewarded in Colombia," and that when Ferreras-Trinidad pled he "became a rat." A third co-conspirator, Carcedo, added that Angulo told him he had thrown away the gloves and clothing he had worn while loading the drugs on board the ship in order to dispose of any evidence against him. An unrelated prisoner, Jose Yamir Lopez-Marrero, testified that while the crew was incarcerated at Pinellas County Jail awaiting trial, Varela explained the Hope II operation to him, including that the vessel had been headed for San Andrés Island where the crew intended to drop off the dope and then sail on to Costa Rica in order to pick up a load of gravel.

For his part, Angulo swore before the jury that he never threatened anyone, and offered an entirely different version of the "verbal fight" with Crespo-Marin. According to Angulo, Crespo-Marin had been rude to him, and Angulo simply responded, "[b]e respectful to me because I've always been respectful to you." In fact, Angulo testified that it was Crespo-Marin who exclaimed that Angulo "didn't know who he [Crespo-Marin] was." As Angulo told it, this altercation had nothing to do with the criminal proceedings.

8

Before trial, Lopez moved to sever his trial from Angulo's, based solely on the possible introduction by Angulo of rehabilitative polygraph evidence. Lopez claimed that the polygraph evidence would prejudice him because the jury might well assume that he either refused to take a lie detector test or, maybe, had failed a similar exam. The district court denied the motion to sever, explaining that severance in a conspiracy trial is particularly disfavored, that none of the exceptional reasons for severance applied in this case, and that a limiting instruction would cure any potential prejudice. During trial, Lopez renewed his motion to sever; Acosta and Varela joined in the application. Again, the trial court denied the motion.

Trial began on June 8, 2015. However, at the conclusion of the Government's case a mistrial was declared because one of the Government's witnesses commented on Acosta's decision not to testify, which, the trial court ruled, was a violation of Acosta's Fifth Amendment rights.

The re-trial began on October 13, 2015. Angulo testified. On direct examination, he swore that he did not know that there were any drugs on the vessel, had not been told anything about any drugs when he was hired or at any point thereafter, and had not been involved with the drug shipment in any way. Angulo also said that he had never before heard of the Hope II's prior drug run. He offered that he had only done maintenance work on the ship and later cooked

9

for the crew.  He further observed that he had been in the process of obtaining a new mariner's license to replace his expired one.  Finally, Angulo testified that he had never been convicted of a crime and that he had no criminal record involving narcotics, but acknowledged that he had been detained once before in the Bahamas in 1998.

On cross examination, the prosecutor elicited details surrounding Angulo's prior detention, which had involved a load of drugs found on another ship, and questioned him further about his role on the Hope II.  Angulo then called as a rehabilitative witness a polygraph examiner he had hired to conduct a polygraph test in preparation for trial.  The polygrapher did not testify about the substance of the examination, but did opine that Angulo had been "truthful when [he had] tested him on November 6th."

The jury deliberated for only two hours before finding all four defendants guilty on both counts.  The district court denied the motion for a new trial, and sentenced each defendant who went to trial to a 235-month term of imprisonment on each of the counts, to be served concurrently, followed by a 5-year period of supervised release.  As for the four co-conspirators who had pled guilty and testified on behalf of the Government, the court sentenced each of them to a 63-month term of imprisonment, followed by a 5-year period of supervised release.

Angulo, Acosta, Varela, and Lopez now timely appeal from their convictions, and Acosta and Varela appeal from their sentences.

## II.

The appellants argue that numerous prejudicial errors infected their trial, and, therefore, that the district court abused its discretion when it denied their motions for a new trial.  We can discern no abuse of discretion in the trial court's determinations.

## A.

Acosta, Varela, and Lopez[1] first claim that the district court abused its discretion by refusing to sever their trial from Angulo's on the ground that Angulo's intended introduction of polygraph testimony would prejudice them.  But they have failed to show that there was any likelihood that impermissible prejudice would arise from the polygraph evidence, or that they were in fact prejudiced in any way.

The decision whether to grant a severance lies within the district court's sound and substantial discretion.  United States v. Lopez, 649 F.3d 1222, 1235–36 (11th Cir. 2011).  "We will not reverse the denial of a severance motion absent a clear abuse of discretion resulting in compelling prejudice against which the district court could offer no protection."  United States v. Ramirez, 426 F.3d 1344,

---

[1] Acosta, Varela, and Lopez have each adopted the others' arguments on appeal, and each has adopted Angulo's arguments as well.

11

1352 (11th Cir. 2005) (quotation omitted). "Joint trials play a vital role in the criminal justice system and serve important interests: they reduce the risk of inconsistent verdicts and the unfairness inherent in serial trials, lighten the burden on victims and witnesses, increase efficiency, and conserve scarce judicial resources." Lopez, 649 F.3d at 1233. We have explained that "defendants who are indicted together are usually tried together." Id. at 1234 (quotation omitted). And "[t]hat rule is even more pronounced in conspiracy cases." Id. This rule is not ironclad. Id. Federal Rule of Criminal Procedure 14(a) explains that

> [i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

The circumstances justifying severance are "few and far between"; a defendant seeking severance "must carry the heavy burden of demonstrating that compelling prejudice would result from a joint trial." Lopez, 649 F.3d at 1234 (quotation omitted and alteration adopted). To establish this level of prejudice, a defendant must show that "a joint trial would actually prejudice the defendant and that a severance is the only proper remedy for that prejudice -- jury instructions or some other remedy short of severance will not work." Id.; see also Zafiro v. United States, 506 U.S. 534, 539 (1993) (noting that limiting instructions will often cure any potential prejudice resulting from a joint trial). It is not enough that a

12

defendant argues he may have a better result had the trials been severed.  Zafiro, 506 U.S. at 540 ("[I]t is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials.").

We have identified four discrete circumstances in which severance may be required: where defendants rely on mutually antagonistic defenses; where one defendant would exculpate another in a separate trial, but will not testify in a joint setting; where inculpatory evidence will be admitted against one defendant that is not admissible against another; and where a cumulative and prejudicial "spill over" may prevent the jury from sifting through the evidence to make an individualized determination of guilt as to each defendant.  United States v. Chavez, 584 F.3d 1354, 1360–61 (11th Cir. 2009).  The final category is limited in application, because "a court's cautionary instructions ordinarily will mitigate the potential 'spillover effect' of evidence of a co-defendant's guilt."  United States v. Kennard, 472 F.3d 851, 859 (11th Cir. 2006).

The district court did not abuse its discretion when it declined to sever this trial.  No antagonistic defenses, exculpatory testimony from co-defendants, or inculpatory evidence were at issue; the appellants can only argue that cumulative and prejudicial spillover warranted severance.  But, for starters, our spillover precedent is generally concerned with circumstances in which "overwhelming evidence of [a co-defendant's] guilt" might bias another defendant -- not

13

circumstances in which evidence of a co-defendant's innocence might spill over. Lopez, 649 F.3d at 1235 (emphasis added). In fact, as the Government points out, any spillover from the polygraph evidence suggesting Angulo's innocence might well have helped the other defendants in this case.

Moreover, the district court made it clear that Angulo's polygraph evidence would only be allowed under "very limited" circumstances: only if Angulo testified and his credibility was impeached could he then present evidence that he passed a polygraph test in an effort to rehabilitate his credibility. "[Testifying] [wa]s a prerequisite to the admission of [the polygraph] evidence"; a prerequisite none of the other defendants satisfied. The conditional and rehabilitative nature of the evidence in question made prejudicial spillover even less likely. We add that the trial court instructed the jury unambiguously to "consider the case of each Defendant separately and individually," and cautioned them that if they "find a Defendant guilty of one crime, that must not affect [the] verdict for any other crime or any other Defendant." And we have repeatedly said that "[a] jury is presumed to follow the instructions given to it by the district judge." Ramirez, 426 F.3d at 1352; United States v. Mock, 523 F.3d 1299, 1303 (11th Cir. 2008).

Finally, it is patently clear that Acosta, Varela, and Lopez cannot show the requisite prejudice to merit reversal. See id. ("We will not reverse the denial of a severance motion absent a clear abuse of discretion resulting in compelling

14

prejudice." (quotation omitted)).  Their argument is built on the possibility that the introduction of the polygraph evidence drew a distinction between Angulo and the other defendants in the minds of the jury, to their demonstrable detriment.  But Angulo ultimately was convicted on both charged counts, just as the others were.  On this record the defendants cannot show that the polygraph evidence helped Angulo -- much less that the jury's rejection of that evidence was likely considered in relation to, or had any deleterious effect on, their verdicts.  The appellants have made no attempt to explain how Angulo's conviction (and the jury's concomitant rejection of his polygraph evidence) does not doom their allegation of prejudice, and so have failed to discharge their "heavy burden of demonstrating compelling prejudice."  United States v. Browne, 505 F.3d 1229, 1268 (11th Cir. 2007).  On this record, we can discern no abuse of discretion in rejecting the severance application.

## B.

The same appellants, Acosta, Varela, and Lopez, also claim that the district court denied them their right to be present during trial when it failed to timely notify them of the pretrial evidentiary hearing to consider the admissibility of Angulo's polygraph evidence.  The appellants did not make this argument before the district court, and so we can review it only for plain error.  Under plain-error review, the defendant is required to show that there is "(1) error (2) that is plain

and (3) that affects substantial rights." United States v. Monroe, 353 F.3d 1346, 1349 (11th Cir. 2003) (quotation omitted). If all three conditions are met, we may exercise our discretion to notice a forfeited error, but only if "(4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. The district court committed no error, plain or otherwise.

The right of a criminal defendant to be present at his trial is axiomatic. "[It] has three bases: the Confrontation Clause of the Sixth Amendment, the Due Process Clause of the Fifth Amendment, and Federal Rule of Criminal Procedure 43." United States v. Novaton, 271 F.3d 968, 997 (11th Cir. 2001). Rule 43 itself explains that the defendant must be present at: "the initial appearance, the initial arraignment, and the plea"; "every trial stage, including jury impanelment and the return of the verdict"; and "sentencing." Considered in concert, the right to be present "extends to all hearings that are an essential part of the trial -- i.e., to all proceedings at which the defendant's presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." Proffitt v. Wainwright, 685 F.2d 1227, 1256 (11th Cir. 1982) (quotation omitted and emphasis added). However, it "does not confer upon the defendant the right to be present at every hearing or conference with the trial judge at which a matter relative to the case is discussed." United States v. Pepe, 747 F.2d 632, 654 (11th Cir. 1984) (quotation omitted, alterations adopted, and emphasis added).

16

Our precedent suggests that there may be no general right to be present at all evidentiary hearings -- let alone at an evidentiary hearing solely relating to the admissibility of exculpatory rehabilitative evidence proffered by another defendant in a joint trial.  Thus, for example, in United States v. Pepe we held that a defendant had no right under the Sixth Amendment or Rule 43 to be present at a pretrial evidentiary hearing to consider whether certain evidence proffered by the Government was inadmissible hearsay.  747 F.2d 632, 652–54 (11th Cir. 1984).  We observed that a hearing that does not "bind the court to make any particular evidentiary ruling at trial" is far from essential, and that Rule 43 "does not apply to hearings on motions made prior to or after trial."  Id. at 653–54 (quoting Fed. R. Crim. P. 43, advisory committee n.1).

But we have no occasion to decide whether defendants have a right to be present at all evidentiary hearings concerning all of the defendants in a case; all we hold today is that the trial court did not commit plain error when it did not notify the other three appellants of Angulo's evidentiary hearing concerning the admissibility of exculpatory polygraph evidence offered by and relating to only one of the defendants.  For starters, this hearing occurred well before trial began.  And it did not concern the guilt or innocence of the other appellants.  Indeed, Angulo's polygraph evidence was not directly relevant to them; the only possibility of prejudice was that the jury might draw adverse inferences from their failure to

17

produce similar evidence. Finally, the hearing did not result in a binding ruling -- in fact, the court explicitly reserved ruling on the evidentiary question for trial. It is simply not plain that the appellants had a right to be present at that hearing.

But even if they did, there can be little question that they have failed to show that they were prejudiced by their absence, let alone that the fairness and integrity of the judicial process has been tainted. The appellants in no way suggest how their presence might have led the court to bar the limited admission of the polygraph evidence. Indeed, if they did have a colorable argument that they might have been able to exclude exculpatory evidence for another defendant, that would have been a ground for severance. But here the appellants do not point to any impact their presence may have had on the evidentiary hearing, and, as we've already said, the defendants cannot show that the admissibility of the polygraph evidence prejudiced them in any way.

Moreover, to the extent appellants suggest they suffered a Sixth Amendment violation because they were unable to cross-examine Angulo's polygraph expert at the pretrial hearing, we are unpersuaded. For one thing, no one introduced any testimony from the pretrial hearing at the trial itself, and, more importantly, the defendants had the opportunity to cross-examine the polygrapher and codefendant Angulo as well at trial.

18

## C.

Turning to the trial itself, the appellants claim reversible error in a discovery violation that occurred when the Government failed to turn over a report about Angulo's 1998 detention in connection with a different cocaine-smuggling ship, and then improperly asked Angulo questions based on the undisclosed report during cross-examination. But the district court properly limited the prosecution's questioning to asking only about information fully disgorged in a report that was available to the defense, and Angulo did not seek any further relief at trial. No prejudice can be shown from the discovery violation.

At the beginning of the Government's cross-examination of Angulo, this exchange occurred:

BY MR. RUDDY [prosecutor]:

Q: Mr. Angulo, let's talk about February 18th, 1998.

A (through interpreter): Yes, sir.

Q: You were on the Motor Vessel Sea Star II; is that right?

A (through interpreter): Yes, sir.

. . .

Q: And also on the vessel were 2236 kilograms of cocaine; right?

A (through interpreter): Correct.

Q: And there were also a lot of line throwing guns and polypropylene lines to be used for at-sea transfers of bales of cocaine; right?

19

MR. KERR [defense counsel]: Your Honor, may we approach?

THE COURT: Yes.

At the bench conference conducted out of the presence of the jury, the court and the parties discussed whether the information underlying these questions had been properly disclosed to the defense.  The court determined that the prosecutor was working from an undisclosed report of the 1998 incident, but that most of the information regarding the incident had previously been disclosed to the defense. The trial court thus agreed with defense counsel that the prosecutor could only ask questions based on information that had previously been disgorged, and defense counsel did not seek any further relief at that time.

After trial, Angulo moved for a new trial on various bases, including the discovery violation and attendant questioning regarding his prior apprehension. The district court denied that motion, finding as to the discovery violation that "there were no questions asked that . . . were unduly prejudicial."

In the context of Federal Rule of Evidence 404(b), the admission of extrinsic act evidence requires "the prosecution to provide notice of its intended use to the defense, regardless of how it intends to use the extrinsic act evidence at trial, i.e., during its case-in-chief, for impeachment, or for possible rebuttal." United States v. Bradley, 644 F.3d 1213, 1273 (11th Cir. 2011) (quoting the advisory committee's note to the 1991 amendments of Rule 404(b)) (alteration adopted).

The Government does not dispute that a discovery violation occurred here -- rather, it argues that the court properly remedied the issue, and the appellants were in no way prejudiced by the error.

When a discovery violation occurs under Rule 404(b) or Federal Rule of Criminal Procedure 16, there is no automatic consequence -- relief for the violation "lies within the discretion of the trial court." United States v. Rodriguez, 799 F.2d 649, 652 (11th Cir. 1986). "To support a claim for reversal . . . , the defendant must show prejudice to substantial rights." See id. (explaining the reversal standard for a Rule 16 violation); Bradley, 644 F.3d at 1273–74 (explaining the reversal standard for a Rule 404(b) violation). We have said that "[s]ubstantial prejudice exists when a defendant is unduly surprised and lacks an adequate opportunity to prepare a defense, or if the mistake substantially influences the jury." United States v. Camargo-Vergara, 57 F.3d 993, 998–99 (11th Cir. 1995).

The problem for the appellants is that they cannot show that the district court abused its discretion. The trial court was correct -- and the defendants do not argue otherwise -- that all of the information contained in the 1998 report, except for information concerning the line guns, had already been disclosed in the handwritten report about the incident that had been provided to Angulo. Thus any possible error or prejudice arising from the discovery violation could only be the result of the prosecutor's single question about the lines and line-throwing guns.

21

No error or prejudice flowed from the singular question.  In the first place, the question was never answered.  The district court sustained the objection to the question before Angulo said anything, and prohibited the government from asking any questions drawn from a document that was not provided to the defense. Moreover, no follow up questions were asked about the line-throwing equipment. The jury never learned whether, according to Angulo, the information was correct or not.  Instead, the bulk of the information the jury heard about the incident -- including the size of the Sea Star II, the number of crew members on board, and most significantly, that 2200 kilograms of cocaine was found on the vessel -- had been disclosed in the report that the Government had provided defense counsel earlier.  Moreover, the district court properly instructed the jury that anything the attorneys said at trial -- which included any questions they asked -- was not evidence.  See United States v. Works, 526 F.2d 940, 945 n.19 (5th Cir. 1976).

There is no showing that the single additional question drawn from the undisclosed report amounted to a surprise robbing defense counsel of the opportunity to prepare a defense.  Angulo asserts that the decisions whether to testify and whether to raise the previous apprehension on direct examination were both difficult ones that would have been influenced by the additional information from the undisclosed report.  While it may be the case that defense strategy decisions were close -- as the decision whether to testify often is -- there is

virtually no explanation how the singular piece of information used from the report to ask a question would have been significant in making those decisions, particularly in light of the inculpatory material that had been disclosed earlier about the prior voyage.

It's worth noting that on direct examination, defense counsel elicited from Angulo that he had no record of criminal history, and that in order to obtain his mariner's license, Angulo had to pass a test certifying that he had no problem in relation to narcotics. Indeed, defense counsel also elicited from Angulo that he was a crew member on the ship in 1998 and that he had been detained in the Bahamas. He was also asked by his lawyer whether he heard anything about whether drugs had been found on the ship and, indeed, whether he had ever seen any drugs onboard the vessel. On cross-examination, the prosecutor also asked, notably without any objection, about whether drugs were found on the vessel. Only when the prosecutor asked about the "line-throwing guns" did defense counsel object and only then did the court bar any inquiry about that singular piece of information.

Finally, it's worth observing that Angulo's counsel did not seek any further relief, such as an instruction to the jury to disregard the question itself, and so any claimed failure by the trial court is reviewable only for plain error. See United States v. Marquardt, 695 F.2d 1300, 1305 (11th Cir. 1983) (rejecting a challenge to

a question that was successfully objected to but still heard by the jury because "[the defendant] never moved to strike [the offending] statement and never moved for a mistrial. The trial court thus did all [the defendant] asked it to do by sustaining the objection."). It was not plain error -- indeed, it was not error at all -- for the court to not strike the question sua sponte.

Appellants also seem to suggest that the bench conference (conducted by the trial court out of the jury's presence) itself somehow was prejudicial because it may have made the jury think that counsel successfully convinced the trial court to bar incriminating evidence relating to Angulo's prior detention, but absent some extraordinary circumstance, a court's discussion of an evidentiary issue out of the presence of the jury (a very common trial procedure) cannot be deemed to be prejudicial.

### D.

All of the defendants also assert error when the prosecutor asked Angulo whether he was the Hope II's "load guard" -- the individual responsible for ensuring the drugs were safely delivered -- without a good-faith basis. But the prosecutor had sufficient reason to ask the question, the district court did not abuse its broad discretion in allowing the inquiry, and regardless any claimed error would have been harmless.

24

Toward the end of the cross-examination of Angulo, this exchange took place between the prosecutor and the defendant:

Q: You know what a load guard is, Mr. Angulo?

A (through interpreter): I don't know because I've never been into that.

Q: You weren't on that vessel to ensure that all the drugs that were going -- the 31 bales that were delivered the first time and the 31 bales that were going to be delivered on the August trip were delivered as planned at sea at night in the middle of the ocean? You were there to verify for the drug owners that those bales were delivered; correct?

A (through interpreter): No, sir.

Q: That's who you are; right?

MR. KERR [defense counsel]: Objection, Your Honor. I assume counsel has a good-faith basis for asking the question.

MR. RUDDY [prosecutor]: No further questions, Your Honor.

THE COURT: The legal basis for the objection?

MR. KERR: You can't ask questions on cross-examination for which you don't have a good-faith basis.

THE COURT: All right, the objection is overruled.

In at least some circumstances, a prosecutor must have a good-faith basis for questions asked during trial.  See, e.g., United States v. Crutchfield, 26 F.3d 1098, 1102 (11th Cir. 1994); United States v. Glass, 709 F.2d 669, 673 (11th Cir. 1983). Even if we assume a good-faith basis was required for the prosecutor's "load guard" question, the district court properly concluded that a sound basis existed,

25

and in any event, any claimed error would have been harmless. Where a good-faith basis is required, that basis "does not have to be definitive proof." Coquina Investments v. TD Bank, N.A., 760 F.3d 1300, 1313 (11th Cir. 2014) (quotation omitted). Based on the testimony of the co-conspirators, there was powerful reason indeed to believe that Angulo had played a specific and substantial role in the drug scheme: among other things, he had been involved at least as a crew member on a different vessel that smuggled more than a ton of cocaine; he operated the crane to move a very large quantity of drugs onboard the vessel in this case; he knew enough to discard clothing and gloves that he had worn evidencing his participation in the drug conspiracy; he lacked a proper mariner's license and thus was less likely to be on the ship for a legitimate maritime reason; and, by one take, he appeared to threaten a co-conspirator with his status and power.

In order to show that the prosecutor could not have thought he was a load guard, Angulo submitted a sworn declaration from a former DEA special agent. The agent opined that "while the captain of this type of ship is almost always involved in the smuggling, crew members are often left in the dark." He further suggested that "it would be unheard of for the lowest-ranking crewmember, the cook, to assume any witting responsibility for the drugs and/or paid role in the overall transaction." He concluded that if there was a load guard, "this man, using drug trafficker logic, would have a considerable record of success in this area

26

before being hired, again, as security for such an immense undertaking"; "[h]is record and reputation would be visible, at minimum, in his life style" -- a conclusion that ran contrary to reports of Angulo and his family living in a shack. But all of this at most only shows ultimately that the prosecutor may have been wrong; it does not establish that the prosecutor acted in bad faith when he asked the question of the defendant. Moreover, much of the evidence drawn from the co-conspirators' testimony flatly contradicts the picture the former DEA agent painted. Thus, for example, the co-conspirators testified that the entire crew was involved in the smuggling enterprise, and one testified that Angulo, the "lowest-ranking crewmember," insinuated by threat that he actually had significant status and power. There was no abuse of discretion in allowing the prosecutor to inquire of the defendant about his putative role as a load guard.

## E.

The appellants also argue that the district court abused its discretion in allowing the prosecutor to introduce inadmissible hearsay evidence. The appellants say that the district judge erroneously allowed the prosecutor to ask one of its own witnesses leading questions based on an agent's summary of an earlier interview with the witness, and later improperly allowed the prosecutor to have sections of the report translated and read to the witness in order to refresh the witness's recollection. Because the appellants concede that these claimed errors do

27

not warrant reversal standing alone, we only review them to determine whether they might have contributed to a claim of cumulative prejudicial error. Here too the district court committed no error.

During the cross-examination of Crespo-Marin, one of the co-conspirators who pled guilty, defense counsel for Varela asked a number of questions regarding what he had told government agents during an interview conducted in January 2015. On re-direct examination, the prosecutor sought to read to Crespo-Marin four paragraphs from a summary of the interview. The defense objected; the prosecution then asserted that the rule of completeness allowed introduction of the remainder of the summary report, since "on cross-examination there were questions asked about details of the report that were published to the jury." The trial court limited the prosecutor to questioning Crespo-Marin only about the report. After asking a few more questions, the defense again objected, claiming that the prosecutor was improperly leading the witness. The court overruled the objection because the agent's report had "been called into question" during cross-examination. After a few more questions were asked, the defense again objected, claiming that the prosecutor was effectively trying to introduce the agent's summary as evidence. The court agreed that the prosecutor had improperly led the witness and sustained the objection.

28

The prosecutor then asked Crespo-Marin whether he had told the agents how cocaine had been loaded onto the Hope II. When Crespo-Marin answered that he had not, the prosecutor asked that a sentence from the agent's report be translated into Spanish and read to Crespo-Marin, in order to refresh his recollection about that matter. The defense unsuccessfully objected. This happened once more, and again the defense unsuccessfully objected on the ground that the jury might overhear the read translation.

The exchange implicated two evidentiary rules on which the prosecution asserted it could, and to some extent was permitted to, use portions of the agent's report from Crespo-Marin's January 2015 interview, both of which the appellants cite as error. First, the appellants claim there was error in initially allowing questioning from the report under the rule of completeness. The appellants also claim error in allowing Crespo-Marin's recollection to be refreshed by having a portion of the report read to the witness in Spanish by the interpreter. Neither constituted an abuse of discretion.

i.

The evidentiary rulings made by a district court are made at the court's discretion. See, e.g., Hessen ex rel. Allstate Ins. Co. v. Jaguar Cars, Inc., 915 F.2d 641, 645 (11th Cir. 1990). The "rule of completeness," as embodied in Federal Rule of Evidence 106, provides: "If a party introduces all or part of a writing or

recorded statement, an adverse party may require the introduction, at that time, of any other part . . . that in fairness ought to be considered at the same time." We have held that the policy behind Rule 106 applies "when a written document is admitted into evidence" or where "a document is used in such a way that it is 'tantamount' to introduction of the document itself." United States v. Ramirez-Perez, 166 F.3d 1106, 1112–13 (11th Cir. 1999). Thus, for example, where a line of questioning led to publication of two paragraphs of a writing, those parts of the writing "effectively were introduced into evidence" and could be subject to the rule of completeness. Id. at 1113 (discussing Rainey v. Beech Aircraft Corp., 784 F.2d 1523, 1529 n.11 (11th Cir. 1986), reinstated on reh'g en banc, 827 F.2d 1498 (11th Cir. 1987), rev'd on other grounds, 488 U.S. 153 (1988)).

Under Rule 106, additional admissions from a writing are allowable when "relevant and . . . necessary to qualify, explain, or place into context the portion already introduced." United States v. Pendas-Martinez, 845 F.2d 938, 944 (11th Cir. 1988). For example, where small portions of a writing are read out of context and give a misleading impression of the full contents of the writing, additional portions of the writing may be admitted to avoid misrepresentation. See Rainey v. Beech Aircraft Corp., 784 F.2d 1523, 1529–30 (11th Cir. 1986). However, we have clarified that after introduction of part of a document, "Rule 106 does not automatically make the entire document admissible." Pendas-Martinez, 845 F.2d

30

at 944.  We have previously overturned a district court's evidentiary decision to allow admission of an entire report into evidence when "the great majority of it was irrelevant to the issue [for which it was introduced]."  Id. at 945.

The appellants say that Rule 106 does not apply here.  That is, the rule of completeness did not allow introduction of the additional portions of the agent's report because the defense had not, in fact, read anything from the report during cross-examination.  Thus, if we understand the argument, there was no "introduc[tion] . . . of a writing or recorded statement," as Rule 106 requires.  Instead, appellants argue, the cross-examination used "information derived from" the report "without ever introducing any verbatim statements from" the report.  The appellants also say that the portions of the report introduced by the prosecution were not relevant to any previous use of the report.  Finally, they urge that the rule of completeness did not allow the prosecutor to ask leading questions based on additional contents found in the report.

The district court considered and limited the use of the report's contents on re-direct in response to the previous use of the report on cross-examination.  It did not explicitly clarify whether it found both that the remainder of the report was subject to the rule of completeness and that the contents introduced by the prosecution were relevant to the explanation of the previously introduced portions.

31

We need not determine whether the district court did, in fact, allow the limited use of the report because of the rule of completeness; whether the rule of completeness applied because the cross-examination use of the report was "tantamount" to the document's introduction; or whether the questioning by the prosecutor effectively introduced parts of the report that were properly relevant to the previously used portions. Instead, we conclude that even if there was any error in the evidentiary ruling, there was no prejudice nor any clear error to contribute to a showing of cumulative error. The first line of questioning from the report was otherwise admissible under Federal Rule of Evidence 801(d)(1)(B), which defines as nonhearsay Crespo-Marin's prior consistent statement "offered to rebut an express or implied charge that [he] recently fabricated [the testimony] . . . or to rehabilitate [his] credibility as a witness when attacked on another ground." See also United States v. Ettinger, 344 F.3d 1149, 1160–61 (11th Cir. 2003) (finding admissible under 801(d)(1)(B) a prior consistent statement of a witness contained in an FBI report offered to rebut an implied charge of recent fabrication during cross-examination).

ii.

There was also no abuse of discretion in permitting the prosecutor to have a few sentences of the report read to Crespo-Marin in Spanish in order to refresh his memory.  Under the Federal Rules of Evidence, any document may be used to refresh a witness's recollection.  See Fed. R. Evid. 612.  And "[w]hen there is careful supervision by the court, the testimony elicited through refreshing recollection may be proper, even though the document used to refresh the witness['s] memory is inadmissible."  United States v. Scott, 701 F.2d 1340, 1346 (11th Cir. 1983).  As the trial court explained, the difficulty here largely arose from examining a Spanish-speaking witness with a document that had been written in English; once the court was notified that the translation might be improperly overheard by the jury, it acted quickly to resolve the issue.  The district court's supervision of the examination was careful and proper.  The appellants also argue that the prosecution did not properly wait for a showing that the witness's memory of the interview had failed before attempting to refresh Crespo-Marin's recollection about the January 2015 interview.  This is not supported by the record.  Instead, the prosecution confirmed it was refreshing Crespo-Marin's recollection, and followed the appropriate procedure to do so, only after Crespo-Marin denied telling the agents a piece of information that was contained in the relevant report.  Again, the record reveals no abuse of discretion.

**F.**

Acosta, Varela, and Lopez further claim that the district court abused its

discretion when it refused to give the following "blind mule" jury instruction:

> If you find from the evidence that a Defendant was unaware of the hidden
> packages of cocaine on the Hope II, then you must find him not guilty,
> because he could not have acted knowingly and willfully.
>
> An unknowing courier is not guilty of possessing cocaine nor is he guilty of
> a conspiracy to distribute cocaine.
>
> In order to find a Defendant guilty, you must be convinced that the
> government has proven beyond a reasonable doubt that the Defendant knew
> of the presence of the hidden packages of cocaine on the Hope II, and that he
> acted with the intent that the hidden cocaine be possessed and delivered.
>
> A Defendant's mere presence on the Hope II without actual knowledge of
> the hidden packages of cocaine does not constitute a conspiracy to distribute
> cocaine, nor does it constitute possession of cocaine with the intent to
> distribute it.
>
> Likewise, the requisite proof of knowledge on the part of the Defendant
> cannot be established by merely demonstrating that the Defendant was
> negligent, careless or foolish.

But this proposed instruction was repetitive of the instructions the trial court

actually gave, and the court did not err in declining to include it.

"We review a district court's refusal to give a requested jury instruction for

abuse of discretion." United States v. Martinelli, 454 F.3d 1300, 1309 (11th Cir.

2006) (quotation omitted). The refusal to give a requested instruction is reversible

"if (1) the requested instruction was a correct statement of the law, (2) its subject

34

matter was not substantially covered by other instructions, and (3) its subject matter dealt with an issue in the trial court that was so important that failure to give it seriously impaired the defendant's ability to defend himself." Id. (quotation omitted).

The trial court unambiguously instructed the jury that the defendants were charged with "knowingly and willfully" conspiring to possess with intent to distribute and to distribute cocaine (Count 1), and with "knowingly and intentionally" possessing with intent to distribute cocaine (Count 2). The court properly defined "knowingly" and "willingly" using these words:

> The word "knowingly" means that an act was done voluntarily and intentionally and not because of a mistake or by accident.

> The word "willfully" means that the act was committed voluntarily and purposely, with the intent to do something the law forbids; that is, with the bad purpose to disobey or disregard the law. While a person must have acted with the intent to do something the law forbids before you can find that the person acted "willfully," the person need not be aware of the specific law or rule that his conduct may be violating.

As for the first count, the district court explained that in order to find a defendant guilty of conspiracy beyond a reasonable doubt, "the Defendant [must have known] the unlawful purpose of the plan and willfully joined in it," later reiterated that to find a defendant guilty that defendant must have "willfully joined in the plan on at least one occasion," and also clarified that "a person who doesn't know about a conspiracy but happens to act in a way that advances some purpose

35

of one doesn't automatically become a conspirator." And as for the second count, the district court explained that in order to find a defendant guilty of knowingly possessing cocaine with intent to distribute, the jury must find, beyond a reasonable doubt, that "the Defendant knowingly possessed cocaine" and "intended to distribute" it. The court emphasized that "[t]o 'possess with intent to distribute' means to knowingly have something while intending to deliver or transfer it to someone else." Finally, the court explained that while a defendant may be found guilty of a crime for aiding and abetting its commission, for this to be the case the jury "must find beyond a reasonable doubt that the Defendant was a willful participant and not merely a knowing spectator."

It is abundantly clear from the record of the court's instructions to the jury that the appellants' requested instruction was unnecessarily repetitive. The court explained in detail what "knowingly" and "willfully" mean, and expressly said that the defendants could not be convicted if these requirements were absent. All the proposed instruction would have done is connect the court's statements of the law about knowledge and specific intent to the facts at issue in this case. Cf. United States v. Takhalov, 827 F.3d 1307, 1318–19 (11th Cir. 2016) (explaining that when given instructions "substantially cover[ ]" more specific requested ones and the only difference is an easily bridged "logical gap," the requested instruction need not be given). The subject matter covered by the requested instruction was not a

technical point of law that might have been overlooked or misunderstood if not emphasized -- rather, it was the entire defense of all of the defendants; was conceptually straightforward; and was discussed by the court at length. In a similar circumstance we have affirmed a district court's non-inclusion of "good faith" instructions explicating how the defendant's knowledge of the specific facts of the case could bear on his guilt, because "[those] concepts were substantially included in the instruction that the criminal act must be done 'knowingly' or 'willfully.'" United States v. Jordan, 582 F.3d 1239, 1248 (11th Cir. 2009). The appellants have offered no reason to think that the court's instructions were insufficient.

## G.

The appellants also claim that even if all of the issues they have raised were harmless, their cumulative effect nevertheless deprived them of a fair trial. "The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." United States v. Baker, 432 F.3d 1189, 1223 (11th Cir. 2005), abrogated in part on other grounds by Davis v. Washington, 547 U.S. 813 (2006) (internal quotation marks omitted). "We address claims of cumulative error by first considering the validity of each claim individually, and then examining any errors that we find in the

aggregate and in light of the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial." Morris v. Sec'y, Dep't of Corr., 677 F.3d 1117, 1132 (11th Cir. 2012). The appellants' cumulative error argument fails because they have been unable to identify any actual error. "This Court has made clear that where there is no error in any of the trial court's rulings, the argument that cumulative trial error requires that this Court reverse the defendant's convictions is without merit." Id. (quotation omitted and alterations adopted).

### III.

Finally, Acosta and Varela urge us to vacate their sentences as being substantively unreasonable. The reasonableness of a sentence is reviewed for abuse of discretion. Gall v. United States, 552 U.S. 38, 51 (2007). On this record, there was no abuse of discretion in either case.

The district court imposed concurrent sentences of 235 months for both Acosta and Varela. As for Acosta, the court found that his total offense level was 40, his criminal history category was I, yielding an advisory guidelines range of 292–365 months' imprisonment along with five years' supervised release on each count. However, after considering the factors identified in 18 U.S.C. § 3553(a) -- balancing Acosta's age (67), medical issues (including Type I diabetes, high blood pressure, and thyroid and kidney issues), light criminal history, and low likelihood of recidivism against the serious nature of the crime

(smuggling more than 1400 kilograms of cocaine) -- the court varied the sentence downward two points, yielding a new advisory range of 235–293 months, and sentenced him at the low end to 235 months' imprisonment on each count, to run concurrently.  The court explained that it was not imposing a life sentence, but acknowledged that, given Acosta's age and the length of sentence, the defendant may well be in custody for the rest of his life.

Acosta claims that his sentence is substantively unreasonable because he will be in excess of 86 years old when released, and that this effectively amounts to a life sentence.  But a sentence which may result in a defendant passing away while in custody, however tragic, is neither automatically a life sentence nor presumptively unreasonable.  See, e.g., United States v. Joseph, 709 F.3d 1082, 1105 (11th Cir. 2013) (affirming a 30-year sentence that the defendant argued "effectively amount[ed] to a life sentence").  On this record, we cannot say that the district court's sentence was substantively unreasonable.  The court considered the § 3553(a) factors; it awarded Acosta a two-point downward variance; and then it sentenced him at the bottom of the new advisory range.  Absent some other indication to the contrary, the sentence did not amount to an abuse of discretion.

As for Varela, the district court determined that his total offense level was 38 and his criminal history category was I, thus yielding an advisory range of 235–293 months' imprisonment, along with five years' supervised release.  Again, the

39

court considered the § 3553(a) factors, and considered and declined Varela's request for a variance. The court sentenced him at the bottom of the guidelines range to 235 months on each count, also to be served concurrently.

Varela claims that his sentence was unreasonable, but he has abandoned this by failing to offer a single specific argument in support of this claim, as required by the Federal Rules of Appellate Procedure. See Fed. R. App. P. 28(a)(8) (explaining that an appellant's argument must contain the "contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies," along with "a concise statement of the applicable standard of review"). "We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority." Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 681 (11th Cir. 2014). But even if we were to address Varela's claim on the merits, we could discern no abuse of discretion. Again, the court considered the § 3553(a) factors and sentenced Varela at the very bottom of his recommended guideline range. The crime was a serious one, and the amount of cocaine was extraordinarily large. "Although we have not adopted a presumption that a sentence within the guideline range is reasonable, we have stated that ordinarily we would expect a sentence within the Guidelines range to be reasonable." Joseph, 709 F.3d at 1105 (quotation omitted).

40

The long and short of it is that the district court managed this trial well. As we see it, the appellants can point to no instance where the trial court abused its discretion, and it's even more clear that they were not impermissibly prejudiced by any of the claimed errors. On this record, we find no ground to upset the jury's verdict or the court's sentences.

**AFFIRMED.**

MARTIN, Circuit Judge, concurring in the judgment:

I concur in large part with the majority opinion, but I have not arrived at my view with the ease the majority opinion displays. I find this to be a closer case. Also, in light of the seriousness of the crimes of which these men have been convicted, and the length of the sentences they will serve, I believe some of the problems with the prosecution and the trial merit further discussion.

The cargo ship known as the Hope II is a 165-foot freighter. About fifteen hundred kilograms of cocaine were found on the ship. The cocaine was hidden in a disguised fuel tank kept in a space accessible only by a single hatch. It took U.S. Coast Guard personnel 17 hours to find it. And these are people trained and experienced in conducting this type of drug search, and accustomed to using sophisticated drug-detection equipment capable of picking up any trace of cocaine. I emphasize these facts to explain (at least part of) the reason why I do not view the defendants' claim of lack of knowledge of the drugs to be so far-fetched as to be reflexively dismissed as untrue. I am also mindful that the defendants' claim of lack of knowledge of the presence of the drugs should be carefully evaluated against the only evidence the government presented as proof that they did know the drugs were there. That is, the testimony of the four cooperating witnesses who had been shipmates of the defendants whose case we consider here.

42

## I.    MOTION TO SEVER & POLYGRAPH EVIDENCE

I ultimately agree with the majority that the convictions of Juan Rodriguez Acosta, Arley Lopez Enciso, and Efrain Bilbao Varela, are not due to be reversed on account of the fourth defendant's, Jesus Hernando Angulo Mosquera ("Mr. Angulo"),[1] presentation of evidence of his polygraph examination. But I read the majority to conclude that no possibility of prejudicial spillover existed from the introduction of Mr. Angulo's polygraph evidence. Maj. Op. at 14–16. My conclusion is different. I am well aware that conflicts routinely arise in multidefendant cases about evidence that might help one defendant, but hurt another. However, the speculation and inferences that necessarily arise from one of several defendants presenting polygraph evidence go beyond this type of run-of-the-mill conflict.

When one defendant presents evidence that he passed a polygraph test, surely a juror would be left to wonder: Why is only one defendant giving us evidence of his polygraph test? Did the other defendants refuse to submit to a polygraph test? Did they take one but fail it? A juror could logically infer from all this that the defendants not submitting polygraph evidence must be guilty. The only other court that I am aware of to have confronted this exact circumstance

---

[1] I refer to him as Mr. Angulo because that is the name he uses in his briefs.

noted that "[t]he admission of [polygraph] evidence as to one defendant does raise questions as to the inferences an unguided jury might draw about the other defendant regardless of whether or not that defendant testifies." SEC v. Saul, No. 90 C 2633, 1992 WL 3696, at *2 (N.D. Ill. Jan. 6, 1992).

Also in contrast to the majority's ruling, I believe the way the District Court conditionally admitted the polygraph evidence increased, rather than lessened, the possibility of prejudicial spillover to the no-lie-detector defendants. Maj. Op. at 14–15. The District Court admitted the polygraph evidence solely for rehabilitation purposes, and in doing so, tied the admission of the evidence to Mr. Angulo's decision to testify. This loaded more significance onto the decision the other defendants had to make about whether to testify. If they chose not to testify, Mr. Angulo would be not just the only defendant to testify, but his testimony could be backed up by polygraph evidence of his truthfulness. This starkly different presentation would certainly amplify any thoughts a juror might have about a defendant choosing not to testify because he is guilty. On the other hand, testifying would come with risks as well. Any codefendant who testified inevitably would draw more attention to the fact that Mr. Angulo had polygraph evidence to rehabilitate his credibility while the testifying codefendant did not. Since this jury was presented with little more than a swearing match between the cooperating witnesses and the defendants (again, all shipmates), the credibility of

44

witnesses was mostly all the jury had to decide.  Polygraph evidence takes on heightened importance in this circumstance.

For me, the government's argument that if the jury believed Mr. Angulo, there would have been an "innocence spillover," only underscores the relationship between Mr. Angulo's polygraph evidence and the jury's decision about the guilt or innocence of his codefendants.  All four codefendants (including Mr. Angulo) offered the same "lack of knowledge" defense to the same charges.  Thus, (1) Mr. Angulo's desire to put polygraph evidence before the jury; (2) the District Court's order allowing the polygraph evidence only if Mr. Angulo testified; (3) Mr. Angulo's decision to testify; and (4) the codefendants' resulting constrained decision not to testify, had the cumulative effect of making Mr. Angulo the de facto spokesperson for the group.  That tied the codefendants' fates to Mr. Angulo's:  If the jury believed him, his codefendants stood to benefit.  If the jury rejected his testimony, his codefendants stood to suffer.

But as I've said, I ultimately agree with my colleagues that this issue does not require reversal of these convictions.  Employing the standard that defendants must meet in this circuit, I cannot say they have shown that the dynamics surrounding the District Court's ruling on the polygraph issues rose to the level of "compelling prejudice," such that "severance [was] the only proper remedy."  See United States v. Lopez, 649 F.3d 1222, 1234 (11th Cir. 2011).  The defendants

point to this as a problem of an "unguided jury." See Saul, 1992 WL 3696, at *2. But we know that this jury was instructed to consider the evidence separately as to each defendant and not to use a defendant's exercise of his right to remain silent as a basis for deciding guilt or innocence. And we assume that juries follow the instructions they are given. See Bruton v. United States, 391 U.S. 123, 135, 88 S. Ct. 1620, 1627 (1968) (noting that in many cases "the jury can and will follow the trial judge's instructions"). Thus, while the introduction of polygraph evidence created a possibility of prejudicial spillover, I have concluded that the District Court did not abuse its discretion by denying the motion for severance.

## II.    ADMISSION OF INADMISSIBLE HEARSAY EVIDENCE

I next take up the government's argument that it was entitled to read from an agent's report to question a cooperating witness on re-direct examination under Federal Rule of Evidence 106, the "rule of completeness." I write only to address the propriety of the government's argument in this regard, which the majority does not decide. See Maj. Op. at 29–30, 32–33.

I do not read the government's argument to be consistent with the record. For example, the government's brief states that "[t]he prosecutor asked Marin about the portion of the report that defense counsel had not read." Gov't Br. at 44. Then, distinguishing this case from another, the government argued that in the other case counsel "had not read from the report to suggest that the witness's

testimony was inconsistent with the report or otherwise attacked the witness's credibility with the report" but "[t]hat is precisely [] what opposing counsel did here." Id. at 47 (alterations adopted). In making these statements, the government represents as a fact these defense lawyers took actions the record reveals they did not. Indeed, a review of the record makes it plain that no defense counsel read from the agent's report or even mentioned the existence of the report. Thus, this argument distorts the record, and the government should not have made it. See Fed. R. Evid. 106 ("If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time."); United States v. Ramirez-Perez, 166 F.3d 1106, 1112–13 (11th Cir. 1999) (holding Rule 106 does not apply when counsel "questioned the agent only about what [a defendant] said rather than about what was written in the document" and "did not refer to th[e] writing").

### III.    GOVERNMENT CROSS-EXAMINATION OF MR. ANGULO

Finally, I address Mr. Angulo's argument that the government was improper in its cross-examination of him.[2] His first claim is based on the government's admitted discovery violation. At trial, the government used a report it had not disclosed to Mr. Angulo, when it questioned him about a 17-year-old incident

---

[2] That is, I address only the two improper questions Mr. Angulo raises on appeal.

47

involving his presence on another ship.  Maj. Op. at 19–21.  The majority reduces

that violation down to a single improper question about "the lines and line-

throwing guns" and determines there was no prejudice.  Id. at 22–24.  Then the

majority marshals evidentiary bits it says could qualify Mr. Angulo as a "load

guard" and blesses that question entirely.  See id. at 27.  I disagree with both

conclusions.

I believe Mr. Angulo was prejudiced by the question about the "line-

throwing guns."  This question was the last in a series designed to point out the

similarities between the 1998 Sea Star II incident and the 2014 Hope II incident.

The prosecutor's questions painted a picture for the jury, starting with the type of

ship; the ship size; the crew size; Mr. Angulo's being there; the presence of over a

ton of hidden cocaine; and, finally, the equipment referred to as "line throwing

guns and polypropylene lines" necessary to make at-sea transfers of cocaine, which

was apparently common to both ships.  Two things become clear from this context.

First, the jury could easily conclude that the last question about the line throwing

equipment revealed more detail about Mr. Angulo's expertise and experience as a

drug trafficker.  Second, as a result of the government's admitted failure to turn

over the report, Mr. Angulo was denied the opportunity to anticipate the question,

48

and be prepared to rebut it and all it implied.[3]  Thus when Mr. Angulo stepped down from the witness stand, the jury was left to understand that Mr. Angulo had a long history of involvement with large cargo freighters equipped with specialized line throwing guns and polypropylene lines used to make at-sea transfers of thousands of kilograms of hidden cocaine.  I don't believe the evidentiary record, as a whole, supports this.  For this reason, I think Mr. Angulo was prejudiced by the government's failure to disclose the report which was the basis for its question about the specialized equipment on the Sea Star II in 1998.

I also believe the government's characterization of Mr. Angulo as a "load guard" during its cross-examination of him "waft[ed] an unwarranted innuendo into the jury box."  See United States v. Tucker, 533 F.3d 711, 714 (8th Cir. 2008) (quotation omitted).  In questioning Mr. Angulo before the jury, the prosecutor defined a "load guard" as one who is "there to verify for the drug owners that those [cocaine] bales were delivered."  However, the evidence the government offers and which the majority accepts to justify the inquiry into this specialized role falls short in my opinion.  Maj. Op. at 27.  The government's basis for inquiring into Mr.

---

[3] Mr. Angulo's attorney argues that

> [h]aving never seen the report, the defense ha[d] no way to know how accurately the prosecutor recounted its contents for the jury.  The defense had no opportunity to learn where the purported drug-smuggling equipment was stored on the large cargo ship, [or] whether Angulo would have had access to it or even reasonably known of its existence.  There was no opportunity to investigate whether the equipment had legitimate uses that may have negated its sinister characterization by the prosecutor.

Angulo's role as a load guard could have qualified anyone on the ship as such.[4]

The cooperating witness's (disputed) statement about Mr. Angulo's threat of

"status and power" never suggested he was a "load guard," or even used that term.

See id. at 8–9, 27. And the government's agents' general knowledge about where

load guards stand in the hierarchy of drug-trafficking organizations is not sufficient

to turn Mr. Angulo's disputed taunt about his status, which the testimony

characterized as general in nature, into a "well reasoned suspicion." See United

States v. Beck, 625 F.3d 410, 418 (7th Cir. 2010) (quotation omitted). A well-

reasoned suspicion requires more than what the government had here.

Compare United States v. Crutchfield, 26 F.3d 1098, 1101–02 (11th Cir. 1994)

(faulting prosecutor for asking witness, who admitted only to personal marijuana

use, about large-scale importation of drug when question was based only on

prosecutor's "personal expertise in the prosecution of drug cases and . . .

knowledge of many illegal activities in the area where the witness resided"), with

Tucker, 533 F.3d at 714 (determining prosecutor had good-faith basis to ask about

---

[4] Indeed, similar evidence would seem to apply to every member of the Hope II crew. For example, one of the cooperating witnesses, Simon Bolivar Ferreras-Trinidad, testified that he was supposed to be paid 10 million Columbian pesos more than the other crew members; that he served as "the deck supervisor" for one trip; and that he was involved in not only loading the crates containing the cocaine onto the ship, but also unpacking the crates and placing the individual bales in the hidden compartment. He also previously was imprisoned by Cuban authorities for trafficking in cocaine, and he had an expired license as well. Euclides Tous-Calle, another cooperating witness, testified that he saw the hidden compartment being built; that he helped load the cocaine into the compartment; and that he threw a satellite phone into the water to prevent its seizure (but allegedly on the captain's order).

defendant's knowledge of robberies based on FBI interview with other participant who said defendant knew of robberies and defendant's admission that she traveled with participant to places that were robbed). That the prosecutor abruptly ended his questioning after asking Mr. Angulo, twice, whether he was a "load guard," is consistent with a goal of leaving the jury with the impression that Mr. Angulo played a role on the ship, for which there was no real evidentiary support.

Within the confines of this record, I believe the government's discovery violation together with its unsupported characterization of Mr. Angulo as a "load guard" prejudiced him. See United States v. Rodriguez, 799 F.2d 649, 652 (11th Cir. 1986) (per curiam) ("The actual prejudice will often turn on the strength of the Government's case."). Aside from the cooperating witnesses' entirely self-serving testimony, the only evidence inculpating Mr. Angulo was his presence on the Sea Star II 17 years earlier when over a ton of cocaine was found there, and the fact of his expired mariner's license, which the majority treats as meaning he was less likely to have a "legitimate maritime reason" to be on the Hope II. See Maj. Op. at 5–11, 27. Mr. Angulo's guilt or innocence thus turned almost completely on his credibility compared to that of the cooperating witnesses. In cases that "turned entirely upon which biased witnesses the jury chose to believe," this Court has recognized that "[e]vidence that tended to erode [the defendant's] credibility and to prejudice the jury against him [] could have had a substantial—perhaps

51

overpowering—impact on the jury's deliberations." United States v. Hands, 184 F.3d 1322, 1332 (11th Cir. 1999).

Despite my view of the problems with the government's actions toward Mr. Angulo, I also think the District Court did the best it could to react to these actions. The court stopped more questions about the undisclosed report. And although the line-throwing question was left hanging, the District Court's failure to strike the question did not, in my view, amount to an abuse of discretion by the court. See United States v. Kelly, 888 F.2d 732, 745 (11th Cir. 1989) ("The abuse of discretion standard has been described as allowing a range of choice for the district court, so long as that choice does not constitute a clear error of judgment."). Finally, the court instructed the jury that what the lawyers say is not evidence. And we presume that juries follow their instructions. See Bruton, 391 U.S. at 135, 88 S. Ct. at 1627. While it's possible that the prosecutor's improper questioning of Mr. Angulo created a "risk that the jury will not, or cannot, follow instructions," see id., Mr. Angulo has not shown that was in fact the case.

I therefore concur in the judgment affirming the convictions of Mr. Angulo, as well as his codefendants.